UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X
RAED HABIB,

                        Plaintiff,

    -against-

UNIVERSAL PROTECTION SERVICE,
LLC, d/b/a ALLIED UNIVERSAL
SECURITY SERVICES,

                        Defendant.
----------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
22-CV-3094 (ENV) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

On May 25, 2022, Plaintiff Raed Habib ("Plaintiff" or "Habib") initiated this

action against Allied Universal Executive Protection and Intelligence Services, Inc. (*See*

Compl., ECF No. 1.) On May 31, 2022, Habib filed an amended complaint against

Defendant "Universal Protection Service, LLC d/b/a Allied Universal Security

Services" ("Defendant" or "Allied"). (*See* Am. Compl., ECF No. 6.) Habib asserted

unpaid wage and retaliation claims pursuant to the Fair Labor Standards Act ("FLSA")

29 U.S.C. §§ 207, 215, *et seq.*, and the New York Labor Law ("NYLL") §§ 190 and 215, *et*

*seq.* The gravamen of Plaintiff's FLSA and NYLL claims is that Defendant retaliated

against him for lodging multiple complaints and for filing lawsuits alleging unpaid

wages. More specifically, Habib alleges that Allied retaliated against him by (1) failing

to find him a suitable new job as a security guard after he left his position with one of

Allied's clients, and (2) then firing him.

Currently before this Court is Defendant's motion for summary judgment as to

all of Habib's claims, which the Honorable Eric N. Vitaliano referred to the undersigned

Magistrate Judge for a report and recommendation. (*See* Def.'s Mot. for Summ. J.

("Def.'s Mot."), ECF No. 33; Dec. 16, 2024 ECF Order Referring Mot.) Defendant asserts that it is entitled to summary judgment because Habib has not established that retaliation caused either of the two alleged adverse employment actions. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem."), ECF No. 33-2, at 10–13, 19–20.)

## PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### I.  Procedural History

As discussed above, on May 25, 2022, Plaintiff initiated this action. (*See* Compl., ECF No. 1.) On May 31, 2022, Habib filed the operative amended complaint against Allied. (*See* Am. Compl., ECF No. 6.) Habib asserts five claims in three categories: first, unpaid wages under the FLSA (count one) and the NYLL (count two); second, retaliation under the FLSA (count three) and the NYLL (count four); and third, a spread-of-hours claim under the NYLL (count five). (Am. Compl., ECF No. 6, ¶¶ 97–130.)

On January 29, 2024, Defendant filed a motion for a pre-motion conference in anticipation of filing a motion for summary judgment. (Letter Mot. for Pre-Mot. Conference, ECF No. 28.) On February 8, 2024, Judge Vitaliano denied the motion for a pre-motion conference and directed the parties to submit a proposed briefing schedule. (Feb. 8, 2024 ECF Order.) On February 15, 2024, the parties filed a proposed briefing schedule, which Judge Vitaliano approved the next day. (Proposed Scheduling Order, ECF No. 30; Feb. 16, 2024 ECF Order.) Defendant's motion was fully briefed as of May 10, 2024. (*See* Def.'s Mot., ECF No. 33; Pl.'s Mem. in Opp'n ("Response"), ECF No. 34; Def.'s Reply, ECF No. 35 ("Reply").) On December 16, 2024, Judge Vitaliano referred Defendant's motion to the undersigned Magistrate Judge for a report and recommendation. (Dec. 16, 2024 ECF Order Referring Mot.) On May 30, 2025, the

undersigned Magistrate Judge held oral argument on the motion. (May 30, 2025 ECF Min. Entry.)

With regard to the unpaid wage claims, Plaintiff has admitted that Defendant owes him no unpaid wages. (Def.'s Rule 56.1 Statement ("Def.'s 56.1"), ECF No. 33-1, ¶ 87; Pl.'s Rule 56.1 Statement ("Pl.'s 56.1"),[1] ECF No. 34-1, ¶ 24 (conceding that it is "[u]ndisputed for the purposes of this motion only" that "[a]t or about the close of discovery Plaintiff conceded he is not owed any wages whatsoever and claims only that he is owed 68.10 unpaid vacation hours").)[2] As to an unpaid vacation pay theory of Plaintiff's wage claims, Defendant asserts, and Plaintiff does not provide evidence to refute, that Allied's written policy does not allow payment for unused vacation time. (Def.'s 56.1, ECF No. 33-1, ¶ 88; Pl.'s 56.1, ECF No. 34-1, ¶ 88.) Given that Plaintiff has conceded his wage claims (other than the unpaid vacation pay claim, which Plaintiff asserts under the NYLL), the Court recommends granting summary judgment for Defendants on these claims, while declining to exercise supplemental jurisdiction over Plaintiff's unpaid wage claim to the extent it states an unpaid vacation time claim that arises exclusively under New York state law.

With respect to the retaliation claims, as discussed below, the summary judgment record includes no direct and very little circumstantial evidence in support of the claim that Plaintiff was fired and not re-hired in retaliation for his engaging in

---

[1] The Court notes that Plaintiff's Rule 56.1 Statement includes both responses to Defendant's statement of facts as well as a separate section setting forth Plaintiff's statement of undisputed facts. (*See* Pl.'s 56.1, ECF No. 34-1, at ECF pp. 23–28.) Unless otherwise noted, citations to Plaintiff's Rule 56.1 Statement refer to Plaintiff's responses to Defendant's Rule 56.1 Statement, not Plaintiff's independent assertions.

[2] (*But see* Pl.'s 56.1, ECF No. 34-1, ¶ 87 (formally denying that Plaintiff conceded Defendant owes him no wages, in contrast with the confirmation of that statement at ¶ 24, but stating only that "Plaintiff is owed vacation pay of $68.10 hours.").)

activity protected under the FLSA and NYLL. Although the standard for summary judgment is high, drawing all reasonable inferences in Plaintiff's favor, the Court ultimately finds that Plaintiff has not advanced sufficient evidence for a reasonable jury to find unlawful retaliation and recommends granting summary judgment as to those claims.

## II.  Factual Background

### A.  Plaintiff's Employment with Allied

In April 2010, Plaintiff began working for U.S. Security Associates, Inc. ("USSA") as an armed security guard at the Sears in Brooklyn. (Def.'s 56.1, ECF No. 33-1, ¶¶ 4, 6; Pl.'s 56.1, ECF No. 34-1, ¶¶ 4, 6.) In October 2018, Allied acquired USSA. (Def.'s 56.1, ECF No. 33-1, ¶ 18; Pl.'s 56.1, ECF No. 34-1, ¶ 18.) Allied began supervising security professionals at Sears Brooklyn in March of 2019. (Def.'s 56.1, ECF No. 33-1, ¶¶ 18–19; Pl.'s 56.1, ECF No. 34-1, ¶¶ 18–19.) USSA is not a defendant in this case. (*See* Am. Compl., ECF No. 6, at 1.)

Throughout his time working for USSA and then for Allied, Plaintiff worked exclusively as an armed guard at the Sears in Brooklyn, aside from several weeks during the COVID-19 pandemic. (*See* Def.'s 56.1, ECF No. 33-1, ¶¶ 4, 6, 63, 29–33 (describing placement at Wegman's in June 2020); Pl.'s 56.1, ECF No. 34-1, ¶¶ 4, 64, 29–33; Habib Dep., ECF No. 33-4, at 71:9–12; Def.'s 56.1, ECF No. 33-1, ¶ 32 (noting that Plaintiff returned to work at Sears on June 29, 2020); Pl.'s 56.1, ECF No. 34-1, ¶ 32.)

From 2014 through May 2021, Dhanpaul Khemraj ("Khemraj") and Zach Hosain ("Hosain") supervised Plaintiff. (Def.'s 56.1, ECF No. 33-1, ¶¶ 7–9; Pl.'s 56.1, ECF No.

34-1, ¶¶ 7–9.)[3] Between 2016 and 2021, Plaintiff repeatedly complained about unpaid wages to these supervisors, and filed several related lawsuits, which are discussed in further detail below. (*See, e.g.*, Def.'s 56.1, ECF No. 33-1, ¶¶ 10, 14, 20; Pl.'s 56.1, ECF No. 34-1, ¶¶ 10, 14, 20.)

On May 20, 2021, Defendant hired Sagirah Abraham ("Abraham"), who replaced Khemraj as Plaintiff's direct supervisor. (Def.'s 56.1, ECF No. 33-1, ¶¶ 34–36; Pl.'s 56.1, ECF No. 34-1, ¶¶ 35–37.) Abraham was responsible for payroll, scheduling, and recruitment. (Tchou Dep., ECF No. 33-10, at 21:14–22.) On or around June 25, 2021, Allied hired Cody Tchou ("Tchou") as a client manager; Tchou supervised Abraham. (Def.'s 56.1, ECF No. 33-1, ¶ 37; Pl.'s 56.1, ECF No. 34-1, ¶ 38.) John Johnson, a general manager at Allied, supervised Tchou. (Def.'s 56.1, ECF No. 33-1, ¶ 38; Johnson Dep., ECF No. 33-13, at 12:24–13:4.) Tchou managed a "book of business" that included 30 to 40 Allied client locations, mostly in Brooklyn. (Def.'s 56.1, ECF No. 33-1, ¶¶ 40, 43; Pl.'s 56.1, ECF No. 34-1, ¶¶ 41, 44.) On or around October 12, 2021, "Tchou learned that Sears Brooklyn would close on November 24, 2021." (Def.'s 56.1, ECF No. 33-1, ¶ 53; Pl.'s 56.1, ECF No. 34-1, ¶ 54.) Habib worked at Sears Brooklyn until October 25, 2021, when a shoplifting incident caused Plaintiff to inform Allied that he would no longer work at that location. (Def.'s 56.1, ECF No. 33-1, ¶¶ 70–72; Pl.'s 56.1, ECF No. 34-1, ¶¶ 70–72.)

In the fall of 2021, when Plaintiff was looking for a new placement, approximately two of the clients in Tchou's book of business, including Sears, employed armed guards. (*See* Tchou Dep., ECF No. 33-10, at 39:15–40:22.) In 2022, at the

---

[3] From June 2, 2020, to June 25, 2020, when Plaintiff worked at Wegman's rather than Sears, Plaintiff's direct supervisor was Marcel Sanchez. (Def.'s 56.1, ECF No. 33-1, ¶¶ 29–31; Pl.'s 56.1, ECF No. 34-1, ¶¶ 29–31.) Plaintiff has not lodged any complaints about unpaid wages related to his time at Wegman's.

time of Tchou's deposition, that number had shrunk to zero. (*Id.*) Tchou was not typically involved in hiring for clients outside of his book of business. (*See* Def.'s 56.1, ECF No. 33-1, ¶¶ 37–43.)

As an armed guard, Habib earned more money per hour than most of Allied's security guards, who are not armed. (Def.'s 56.1, ECF No. 33-1, ¶ 56; *see also* Pl.'s 56.1, ECF No. 34-1, ¶ 57 (providing no evidence to dispute this claim).) By the end of his employment with Allied, Plaintiff earned $28.85 per hour, with time-and-a-half for overtime. (Def.'s 56.1, ECF No. 33-1, ¶ 116; Pl.'s 56.1, ECF No. 34-1, ¶ 116; *see* Habib Dep., ECF No. 33-4, at 89:14-20.)

### B. Allied's Employment Policies and Practices

The summary judgment record contains somewhat limited information about Allied's employment policies and practices. (*See* Oral Arg. Tr., ECF No. 37, at 65:24–68:22.) As noted, one aspect of Habib's claims is based on Allied's alleged failure to place him in a new position after he stopped working at Sears in Brooklyn. Of relevance here, Defendant's transfer policy states, in pertinent part:

> In most cases, if a transfer is initiated or you are removed from a customer site for any reason (initiated by you or the company), you will remain an employee of the company and the company will make reasonable efforts to identify another position for which you are qualified. Since pay rates and schedules vary from assignment to assignment, depending on individual customer contracts, the company may not be able to offer you a position at the same pay rate, benefits or schedule. After an assignment or post ends, an employee is no longer working under the pay scale for Employee's previous post or assignment. Therefore, Allied Universal will pay employees for any work performed prior to receiving a new assignment at the minimum wage. This includes pre-assignment duties such as interviews.
>
> When a transfer is required/requested, you will be notified of the new location, schedule and pay rate for that assignment. You will be provided with a "Job Offer/Transfer Acknowledgment" form on which you may

elect to accept or decline the job offer/transfer.[4] However, if you refuse to accept available work after three (3) offers or three (3) weeks of being on "active but not working" status (whichever comes first), you will be considered to have voluntarily resigned your employment due to your failure to accept available work.

Transfer requests to a different Branch location in the company may be considered, but are not guaranteed. Employees who self-relocate to a new geographic location may apply and be considered for available job openings at a Branch in the new location — however, such are not guaranteed unless a written job offer has been made to the employee.

(AU Work Assignments and Transfers Policy, ECF No. 33-12.)[5]

As to how an Allied security guard can obtain a transfer, Plaintiff's supervisors described a system that, in practice, required Allied employees to apply for open positions before a hiring manager could place them in a new post. (*See* Johnson Dep., ECF No. 33-13, at 59:24–60:3 ("If we have similar openings we'll discuss that with the employee. If we don't have similar openings, we advise the employees to look at our website."), 61:18–63:7 (noting that the transferring employee must apply for open positions, and that the only person at Allied responsible for trying to find a replacement position for the transferring employee is their direct supervisor (in this case, Abraham)); Tchou Dep., ECF No. 33-10, at 77:5–80:3 (describing how employees must apply for positions with other managers).) Similarly, Johnson explained that when a client site closes, "we notify the employees and then it's frankly up to the employees to go online

---

[4] Allied's director of Human Resources has stated that these forms are used when "presenting active employees with a transfer," and that the policy is "not used to hire or rehire employees." (Lorberbaum Decl., ECF No. 35-1, ¶ 5.) Defendant has also represented that when an active employee seeks a transfer, "failure to use a Job/Offer Transfer Acknowledgement in no way invalidates or diminishes an offer extended by an Allied Universal manager under Allied Universal's policies procedures or practices." (*Id*. ¶ 6.) The policy does not state when each of these steps need occur in relation to one another. In the summary judgment record, Plaintiff has adduced no evidence to rebut Lorberbaum's declaration regarding how these policies work at Allied. (*See* Oral Arg. Tr., ECF No. 37, at 8:11–11:3.)

[5] Plaintiff claims that he never received a copy of this policy, but that he found a copy of it on the internet. (Habib Dep., ECF No. 33-4, at 117:16–118:12.)

and apply for other positions that they want to work at." (Johnson Dep., ECF No. 33-13, at 26:11–15.)

As to hiring and firing more generally, Allied has no centralized hiring system. (Def.'s 56.1, ECF No. 33-1, ¶ 42; Pl.'s 56.1, ECF No. 34-1, ¶ 43.) Rather, the evidence adduced on summary judgment indicates that, in 2021, general managers like Johnson, client managers like Tchou, supervisors like Abraham, and the Human Resources department all contributed to hiring and firing decisions. (Johnson Dep., ECF No. 33-13, at 13:5–14:5, 16:7–17:15.) Before terminating an employee, Tchou and Abraham would typically need to consult with supervisors unless the employee had clearly violated company policy. (*See id.* at 17:16–18:23.)

As for obtaining a new position at Allied, the application process generally requires applying through a "bot" called SAM. (Habib Dep., ECF No. 33-4, at 68:12–20; *see also* Habib Texts re Work, ECF No. 34-14, at ECF p. 2.) After receiving an application, the bot asks a series of questions. (Habib Dep., ECF No. 33-4, at 68:21–69:8.)[6] During discovery, there was no Rule 30(b)(6) deposition of a representative from Allied or other

---

[6] The record includes part of a text interaction between Plaintiff and SAM, which depicts cut-off portions of a conversation, reading in part, "Thanks for your interest in the Armed Security Officer – Elections Office – Hudson Yards Manhattan (648959) position. Before I can schedule an interview, I will ask a few questions to make sure it's the best job for you. Please respo". (Habib Texts re Work, ECF No. 34-14, at ECF p. 2.) The message also includes an attached document. (*Id.*) Plaintiff responded "Yes," and SAM replied with information and an initial question about grooming standards. (*Id.*) The rest of the conversation does not appear in that document or elsewhere in the record. The summary judgment record does not reveal whether Plaintiff responded to all of the bot's follow-up questions, and Plaintiff has offered no evidence on summary judgment regarding what happened to his applications for a new placement at one of Allied's sites. *See infra* note 7.

evidence developed on what happens internally at Allied after an employee applies to a position through SAM. (*See* Oral Arg. Tr., ECF No. 37, at 66:17–22, 35:1–11.)[7]

## C. Pre-Termination Protected Activity

Plaintiff has filed four lawsuits, including this one, against Allied or its predecessor alleging unpaid wage claims.[8] Plaintiff has also made informal oral and written complaints about unpaid wages to his supervisors. As detailed below, he made two written complaints in the six months before his termination, and one after his termination. Two lawsuits, two informal written complaints, and the alleged regular oral complaints are most relevant here and are described below.

### 1. *The 2020 Lawsuit*

On February 7, 2020, while working at Sears Brooklyn, Plaintiff sued Defendant Allied, seeking compensation for "one week unpaid vacation and a few hundred dollars." (Def.'s 56.1, ECF No. 33-1, ¶¶ 20–21; Pl.'s 56.1, ECF No. 34-1, ¶¶ 20–21.) This lawsuit ("the 2020 lawsuit") concerned a period in which operations manager Khemraj

---

[7] At oral argument, Plaintiff's counsel confirmed this gap in the record.

| | |
|---|---|
| THE COURT: | So was there any evidence established during discovery as to what happened after he applied through the bot? You know, again, bots don't run companies, people do. So at some point there's going to be some output from the bot, right? Is there any evidence in the record that somebody at Allied who knew about these lawsuits denied him a position or hid a position from him? |
| MS. DONNELLY: | No, your Honor. We don't know where it went. We don't know why he wasn't given one interview. |

(Oral Arg. Tr., ECF No. 37, at 35:1–11.)

[8] In 2016, Plaintiff filed his first lawsuit against USSA, in which he alleged unpaid vacation and a pay discrepancy, resulting in a damages award of $2,500. (Def.'s 56.1, ECF No. 33-1, ¶¶ 10–12; Pl.'s 56.1, ECF No. 34-1, ¶¶ 10–12.) This first lawsuit against USSA, a non-party, is not overly relevant here because Plaintiff has not established that any of Plaintiff's supervisors in 2021 had knowledge of the 2016 case, and Plaintiff does not clearly allege retaliation on the basis of the 2016 lawsuit. (*See generally* Am. Compl., ECF No. 6; Pl.'s Mem., ECF No. 34.)

and client manager Hosain supervised Plaintiff. (Def.'s 56.1, ECF No. 33-1, ¶¶ 27–28; Pl.'s 56.1, ECF No. 34-1, ¶¶ 27–28.) Plaintiff withdrew the lawsuit after realizing his calculations were incorrect. (Def.'s 56.1, ECF No. 33-1, ¶ 22; Pl.'s 56.1, ECF No. 34-1, ¶ 22.)

The record contains little evidence to establish which, if any, of Plaintiff's supervisors in 2021, when the events underlying this case transpired, were aware of the 2020 lawsuit or any prior unpaid wage complaints. (*See* Def.'s 56.1, ECF No. 33-1, ¶ 39; Tchou Dep., ECF No. 33-10, at 131:4-12 ("[T]he only complaint [to or against Defendant Allied] that I was aware of was that he wanted to work less and that he needed some assistance as he had been working, again, seven days a week for a very long period of time."); *but see* Tchou Dep., ECF No. 33-10, at 109:8–14, 110:3–12 (indicating Plaintiff had told him about a lawsuit against USSA without providing any further detail).) In response to Tchou's deposition testimony, Plaintiff neither confirmed nor denied Tchou's claimed lack of knowledge. (*See* Pl.'s 56.1, ECF No. 34-1, ¶ 40.) At the hearing on this motion, Plaintiff's counsel confirmed that no evidence in the record demonstrates that any of Plaintiff's supervisors in 2021 knew of his lawsuits prior to the one he filed in November of 2021. (*See* Oral Arg. Tr., ECF No. 37, at 14:24–15:20.)

2. *The November 2021 Lawsuit*

Plaintiff filed another lawsuit for unpaid wages against Allied on November 12, 2021, in New York state court. (Def.'s 56.1, ECF No. 33-1, ¶¶ 85–86; Pl.'s 56.1, ECF No. 34-1, ¶¶ 85–86.) Allied received service of that complaint on November 15, 2021. (Def.'s 56.1, ECF No. 33-1, ¶ 90; Def.'s Mem., ECF No. 33-2, at 18. *But see* Pl.'s 56.1, ECF No. 34-1, ¶ 90 (noting that Abraham received a screenshot of the lawsuit on November 12, and

claiming that the complaint was served on Abraham on November 13).)[9] Shortly after learning of the complaint, Tchou alerted his manager, John Johnson, via email about the lawsuit and summarized the unpaid wage claim. (Def.'s 56.1, ECF No. 33-1, ¶ 91 ("[Plaintiff i]s trying to claim that we owe him $25,000 plus interest for unpaid wages dating back to 10/25/2016, which surely cannot be true.")[10]; Nov. 15, 2021 Email, ECF No. 33-29, at ECF p. 3.) In response, Johnson asked Tchou if Habib had "ever brought unpaid wages to [Tchou's] attention," and if not, to "give him a call and ask what this is about." (Def.'s 56.1, ECF No. 33-1, ¶ 92; Nov. 15, 2021 Email, ECF No. 33-29, at ECF p. 3.) Tchou wrote back that Plaintiff had "never mentioned anything about this before in the past." (Nov. 15, 2021 Email, ECF No. 33-29, at ECF p. 2.)

### 3. *Informal Complaints*

Plaintiff has adduced evidence showing that he complained to his supervisors about unpaid wages at various times throughout his employment. Many of these complaints appear to have been directed to Khemraj between May 2016 and May 2021. (*See* Def.'s 56.1, ECF No. 33-1, ¶ 13; Pl.'s 56.1, ECF No. 34-1, ¶ 13 (describing complaints

---

[9] In support of Plaintiff's claim that the service date was November 13, Plaintiff seems to cite either the Bush Declaration at ECF No. 34-2, or the Habib Declaration at ECF No. 34-3. Plaintiff provides a pincite that does not align with either document. Further, Plaintiff's declaration indicates that Tchou found out about the lawsuit on November 15, 2021. (*See* Habib Decl., ECF No. 34-3, ¶ 80.)

[10] In response to this paragraph of Defendant's Rule 56.1 statement, Plaintiff responded that "Plaintiff has no independent information to deny or admit these assertions." (Pl.'s 56.1, ECF No. 34-1, ¶ 91.) To rebut an allegedly undisputed fact based on evidence in the record, parties must either cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or demonstrate "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c); *Lener v. Hempstead Pub. Sch.*, 55 F. Supp. 3d 267, 274 (E.D.N.Y. 2014). Unless otherwise stated, where Plaintiff responds to allegedly undisputed material facts without providing citations to any evidence, the Court finds Defendant's position unrebutted.

to Khemraj).) As discussed above, Abraham replaced Khemraj as Plaintiff's supervisor in May 2021, months before Plaintiff left Sears and his employment was terminated. (Def.'s 56.1, ECF No. 33-1, ¶¶ 35, 37, 118; Pl.'s 56.1, ECF No. 34-1, ¶¶ 35, 37, 118.) Plaintiff also testified at his deposition that he complained to Abraham about unpaid wages regularly, i.e., Plaintiff testified that he complained about unpaid wages "from 2010 to 2021" and that he felt "like a broken record . . . every week getting paid to complain about the pay, to complain about the money," while working overtime. (Habib Dep., ECF No. 33-4, at 109:2–18, 110:14–20.)

The record contains evidence of one clear written informal complaint about unpaid wages to an Allied employee who supervised Plaintiff in 2021. Specifically, on June 22, 2021, Plaintiff texted Abraham to notify him that Plaintiff's paycheck was missing pay for 5.25 hours of work. (Def.'s 56.1, ECF No. 33-1, ¶¶ 94–95; Pl.'s 56.1, ECF No. 34-1, ¶¶ 94–95.) Abraham responded within several minutes, informing Plaintiff that the overtime pay he had asked about was on its way through a separate check, which was set to arrive the next day. (Def.'s 56.1, ECF No. 33-1, ¶ 96; Pl.'s 56.1, ECF No. 34-1, ¶ 96.) Separately, Plaintiff alleges that he complained to Abraham about unpaid wages on November 5, 2021. (Pl.'s 56.1, ECF No. 34-1, ¶ 94.) The text on which Plaintiff relies reads as follows: "Good morning abraham, I would like to get paid for a week vacation, also do you have a job for me? I didn't hear from you since October 26. Thanks."[11] (Abraham Screenshots, ECF No. 34-10, at ECF p. 3.)

---

[11] To the extent Plaintiff's unpaid wage claim encompasses a claimed entitlement to vacation pay, such claims are not generally cognizable under the FLSA. For the reasons discussed *infra*, the Court recommends declining to retain supplemental jurisdiction as to this aspect of Plaintiff's claim, which may arise under the NYLL. *See infra* Discussion, Section III.

Plaintiff also claims he made additional complaints to Abraham about unpaid wages during the period in which Abraham supervised him, but the record does not include written records of any complaints, despite Plaintiff's request that "from now [July 22, 2021] forward all communication has to be [d]ocumented." (Abraham Screenshots, ECF No. 34-10, at ECF p. 5; *see generally* Habib Dep., ECF No. 33-4; Tchou Dep., ECF No. 33-10.) Abraham, who has since stopped working at Allied, was not deposed in this case and the parties agree that Defendant Allied could not locate him. (*See* Oral Arg. Tr., ECF No. 37, at 14:18–15:2.) Plaintiff has not advanced evidence to demonstrate whether, when, or how he made additional, specific wage complaints.

In addition, in November 2021, Plaintiff sent Abraham two text messages. First, Plaintiff indicated that "I got alert every day from Allied about the new available jobs, you never contacted me or any one else about these jobs, it's very clear what you guys doing and it's against the law and the company policies." (Texts between Abraham and Plaintiff, ECF No. 33-6, at ECF p. 2.)[12] On November 12, 2021, Plaintiff texted Abraham, "As I promised you, this is one of 2 lawsuit against Allied universal because of you and everyone else responsible about the situation I am in." (*Id.*) Abraham never responded. (*See id.*).

Prior to filing the November 2021 lawsuit, Plaintiff had never raised any issues related to unpaid wages with Tchou. (Def.'s 56.1, ECF No. 33-1, ¶ 93; Pl.'s 56.1, ECF No.

---

[12] The Court notes that this document includes a title that says "Conversation with: Danny Khemraj/Abraham Sagirah (+19175966023)." (Texts between Abraham and Plaintiff, ECF No. 33-6, at ECF p. 2.) Plaintiff indicated that when Abraham took over for Khemraj, he also took over Khemraj's phone number. (*See* Habib Dep., ECF No. 33-4, at 99:19–100:3.) As noted above, Abraham took over for Khemraj on or around May 20, 2021. (Def.'s 56.1, ECF No. 33-1, ¶¶ 34–36; Pl.'s 56.1, ECF No. 34-1, ¶¶ 35–37.)

34-1, ¶ 93.) The record does not reflect informal complaints about wages to any other managers at Allied.

## D. Alleged Adverse Employment Actions

Plaintiff's retaliation claim is based on two adverse employment actions Allied took against him. First, Allied did not assign Plaintiff to a new position after he ceased working at Sears on October 25, 2021. (Am. Compl., ECF No. 6, ¶¶ 113, 123; *see also* Def.'s Mem., ECF No. 33-2, at 11.) Second, Allied notified Plaintiff on November 19, 2021, that his employment at Allied was being terminated. (Am. Compl., ECF No. 6, ¶¶ 114, 124; *see also* Def.'s Mem., ECF No. 33-2, at 11.)

The very basic facts of these events are not in dispute, but how to characterize the import of the events is sharply contested. First, the parties agree that Plaintiff ceased working at Sears in Brooklyn on October 25, 2021. Allied claims that Plaintiff quit on October 25, 2021, after a shoplifting incident. (Def.'s 56.1, ECF No. 33-1, ¶¶ 70–72.) Plaintiff disputes that he "quit," and testified that he thought his supervisors were looking for a new placement for him. (Pl.'s 56.1, ECF No. 34-1, ¶¶ 70–72 (denying that Plaintiff "quit" but admitting that he left Sears, was replaced, and was waiting for reassignment to a new location); Habib Dep., ECF No. 33-4, at 115:25–116:6 ("Q. So after that incident happened you told Sears and you told Abraham that I am not working at Sears anymore; is that correct? A. Yes, that happened that night, October 25th.").) Regardless of whether Plaintiff "quit," the record makes clear that Plaintiff did not work as a security guard at Sears Brooklyn after October 25, 2021, and that no one from Sears or Allied made that decision for him. (*See* Habib Dep., ECF No. 33-4, at 115:25–116:6.)

Second, after leaving Sears, Habib was not placed in a new position at Allied within 21 days. (Response, ECF No. 34, at 19–20; *see, e.g.,* Def.'s 56.1, ECF No. 33-1,

¶¶ 70–84 (detailing Plaintiff's communications with Tchou and Abraham after leaving the Sears position, including discussion of work prospects); Pl.'s 56.1, ECF No. 34-1, ¶¶ 70–84 (same).)

Third, on November 19, 2021, Tchou notified Habib that his employment with Allied was being terminated, with eligibility for rehire. (Def.'s 56.1, ECF No. 33-1, ¶¶ 118–19 (citing texts between Tchou and Plaintiff, ECF No. 33-24); Def.'s Mot., ECF No. 33-2, at 18; *see also* Pl.'s 56.1, ECF No. 34-1, ¶ 118.) The text Tchou sent to Plaintiff stated:

> Good morning Raed, just wanted to remind you again that if you are interested in working with Allied at a different location, feel free to apply for those job listing[s]. In the meantime, we will be separating you from the company, with a status of being eligible for re-hire, as you have not worked with us for 25 days and counting.

(Def.'s 56.1, ECF No. 33-1, ¶ 118; *see also* Pl.'s 56.1, ECF No. 34-1, ¶ 118 ("DENY. Plaintiff was terminated in retaliation for filing complaints and lawsuits about unpaid wages.").)[13]

Fourth, also on November 19, 2021, Plaintiff's name was included on a "No Hours Report" because he had not worked in over 21 days, and was thus subject to automatic termination at the end of the month. (Def.'s 56.1, ECF No. 33-1, ¶¶ 121–23 (explaining Allied's policy of terminating employees who have not worked for 21 days or more); Pl.'s 56.1, ECF No. 34-1, ¶¶ 118–19 (formally denying claim without disputing termination or content of the text message from Tchou, and without providing record citations to support denial).)

---

[13] As set forth above, Allied's written policy states that if employees "refuse to accept available work after three (3) offers or three (3) weeks of being on 'active but not working' status (whichever comes first), you will be considered to have voluntarily resigned your employment due to your failure to accept available work." (AU Work Assignments and Transfers Policy, ECF No. 33-12.)

From there, the parties diverge significantly. Plaintiff contends that Defendant was required to place him in a new position after he left Sears, and they failed to do so, allegedly because of Plaintiff's protected activity. Defendant claims that Allied was not required to place Plaintiff in a new position at all. The following facts regarding efforts to find Plaintiff a new position are not in dispute, unless otherwise indicated.

1. *Placement Efforts Before Termination*

As set forth above, the evidence in the record shows that existing Allied employees seeking a transfer must typically apply for new positions; transfers are not automatic. (*See* Johnson Dep., ECF No. 33-13, at 26:10–15.) Here, although Plaintiff contacted his supervisors and other managers to request work prior to learning of his termination on November 19, 2021, there is no dispute that he did not formally submit any job applications at Allied after learning of the impending closure of Sears Brooklyn or after he ceased working there.[14] (Pl.'s 56.1, ECF No. 34-1, ¶ 84; Oral Arg. Tr., ECF No. 37, at 28:9–12, 30:8–11; 30:24–31:10.)

After learning about Sears's impending closure and before Plaintiff stopped working at Sears, Plaintiff's direct managers and other managers at Allied sought information about new positions for Plaintiff. For example, on October 12, 2021, Tchou emailed Johnson and Abraham to "see if we can get his availability so that we can place him elsewhere if possible." (Def.'s 56.1, ECF No. 33-1, ¶ 63 (emphasis omitted) (quoting Oct. 12, 2021 Email, ECF No. 33-30); Pl.'s 56.1, ECF No. 34-1, ¶ 64.) Between October 5, 2021 and October 21, 2021, Tchou also contacted other managers and Allied staff

---

[14] At oral argument, Plaintiff's counsel conceded that Plaintiff did not formally apply to any open Allied positions before his termination. (*See* Oral Arg. Tr., ECF No. 37, at 30:8–11.) Plaintiff also did not conduct a Rule 30(b)(6) deposition of an Allied representative and the summary judgment record is relatively quiet on Allied's hiring practices. (*See id.* at 66:17–22.)

members to seek work for Plaintiff. (*See* Def.'s 56.1, ECF No. 33-1, ¶¶ 64–65 (praising Plaintiff in an email to Tchou's supervisor), ¶ 67 (soliciting opportunities for Plaintiff from Willie Quirke).) Other than the Sears posting Plaintiff left, however, in October 2021, the only evidence in the summary judgment record on this topic shows that Tchou's book of business contained no other armed security positions. (Def.'s 56.1, ECF No. 33-1, ¶ 84 (citing Johnson Dep., ECF No. 33-13, at 43:10–17); Pl.'s 56.1, ECF No. 34-1, ¶ 84 (denying that there were no full timed armed security positions in Tchou's book of business without advancing any evidence in support of that denial).)

Other managers also tried to find work for Plaintiff before he was terminated. After Plaintiff emailed Joe Tuccio, a General Manager, on October 30, 2021, Tuccio forwarded his resume to Stacey Leary ("Leary") and Andrew Spieler ("Spieler"), two client managers who were "overseeing hiring for their accounts." (Def.'s 56.1, ECF No. 33-1, ¶¶ 101–04.) Spieler told Tuccio that Plaintiff was a "good candidate," and forwarded an email from Habib to another Allied employee, Matthew Regan, and later followed up with Plaintiff to see if he had spoken with Leary. (*Id.* ¶¶ 104–05, 107.)

The evidence indicates, however, that in the fall of 2021, there were few armed guard positions available at Allied, and that Plaintiff was not qualified for any of the positions about which there is evidence in the record. From October through December 2021, there were only about two clients in Tchou's book of business, including Sears, that employed armed guards. (*See* Tchou Dep., ECF No. 33-10, at 39:16–40:18.) During the same period, Allied appears to have had five openings for armed guard positions in Brooklyn, all of which required correctional, military, or policing experience that Habib lacked. (Def.'s 56.1, ECF No. 33-1, ¶¶ 59–62; Open Positions, ECF No. 33-31 (describing five job listings, all of which contractually required military, policing, or correctional

17

experience as "Pre-Employment Requirements").)[15] Plaintiff denies these factual claims, and swears that none of the open Allied positions that he applied for after his termination required this specialized experience. (*See* Pl.'s 56.1, ECF No. 34-1, ¶ 59; Habib Aff., ECF No. 34-3, ¶¶ 56, 58.)

Tchou testified that he and Abraham called Plaintiff repeatedly to try to speak to him about available opportunities, but that Plaintiff never picked up the phone or called back. (Tchou Dep., ECF No. 33-10, at 17:13–22:5.) Plaintiff asserts that he did respond to these phone calls but has not proffered any admissible evidence to refute Defendant's evidence on this point. (*See* Oral Arg. Tr., ECF No. 37, at 19:4–7.) The summary judgment record lacks corroborating evidence, such as phone records or call logs, regarding these alleged phone calls. (*See id*. at 18:8–19:3.)

On November 5, 2021, before Plaintiff was notified about his termination, Abraham texted Plaintiff an offer for a short-term job at T-Mobile. (Def.'s 56.1, ECF No. 33-1, ¶ 77 (citing Texts between Abraham and Plaintiff, ECF No. 33-15); Pl.'s 56.1, ECF No. 34-1, ¶ 77.)[16] Plaintiff responded that "equal work or better will be fine," but that the T-Mobile posting was a "demotion." (Def.'s 56.1, ECF No. 33-1, ¶ 80 (alterations and emphasis omitted); Pl.'s 56.1, ECF No. 34-1, ¶ 80.) Plaintiff also told Abraham he "should know better" than to reach out about jobs like this and said that he would "see [Abraham] in court." (*Id*.) Abraham responded that he was trying to offer a short-term

---

[15] The summary judgment record contains no documentary evidence about the armed guard positions in Tchou's book of business during the relevant period, including any requirements. And although there is some evidence regarding the available armed guard positions in Brooklyn, the summary judgment record does not show whether Allied had other armed guard positions available throughout New York City in or about and between the fall of 2021 and the Spring of 2022.

[16] At oral argument, Plaintiff's counsel conceded that the T-Mobile job offer was, in fact, a job offer. (*See* Oral Arg. Tr., ECF No. 37, at 6:8–16.)

position and would "not text [Plaintiff] again." (Def.'s 56.1, ECF No. 33-1, ¶ 81 (quoting Texts between Abraham and Plaintiff, ECF No. 33-6, at ECF p. 2); Pl.'s 56.1, ECF No. 34-1, ¶ 81; Abraham Screenshots, ECF No. 34-10, at ECF p. 2.) Based on their understanding that Plaintiff did not want part-time or less-well-paid work, and because neither Abraham nor Tchou had armed guard positions available in their book of business, neither Abraham nor his supervisors contacted Plaintiff with additional opportunities before his termination. (Def.'s 56.1, ECF No. 33-1, ¶¶ 81–83; Pl.'s 56.1, ECF No. 34-1, ¶¶ 81–83 (denying these statements without citing evidence from the record in support of that denial).)

### 2. *Placement Efforts After Termination*

Plaintiff's failure to hire retaliation claim stretches through May of 2022.[17] Plaintiff claims that he applied to at least 57 security positions, 12 of which were at Allied, with his first Allied position submitted on December 1, 2021. (Pl.'s 56.1, ECF No. 34-1, ¶¶ 58–63; *see* Job Appls., ECF No. 34-15, at ECF pp. 17–20.) The evidence Plaintiff submitted regarding these job applications indicates, but does not clearly establish, that he applied to 51 jobs, 12 of which were at Allied. (*See* Job Appls., ECF No. 34-15, at ECF pp. 17–20 (listing 51 job applications apparently submitted between October 31, 2021, and April 5, 2023, including prospective employer and date of application without

---

[17] Plaintiff's complaint does not separately allege a failure to hire claim concerning the time period after Plaintiff's termination in November 2021, but Plaintiff contends that Allied's unwillingness or inability to find him an adequate job after he was fired evinces a continuation of the retaliation he suffered before his termination. (*See, e.g.*, Response, ECF No. 34, at 14–17.) It is well settled that an employer can be held liable for retaliating against a former employee. *Vazquez v. 142 Knickerbocker Enters., Corp.*, No. 13-CV-6085 (EK) (PK), 2024 WL 4437164, at *14 (E.D.N.Y. Oct. 7, 2024) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (holding that Title VII prohibits retaliation against former employees), and *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010) (holding that courts should apply the same standard in FLSA retaliation cases as they do in Title VII retaliation cases)). In recognition of this principle, the Court interprets Plaintiff's failure to hire retaliation claim to include retaliation up to the date of the filing of this complaint, on May 25, 2022.

indicating where this document originated); *id*. at ECF pp. 2–16 (providing partially illegible photos of printed application confirmations to positions at Allied and at other companies).)[18]

In addition to the communications discussed above, the summary judgment record includes evidence that illustrates other Allied employees tried to help find Plaintiff a new position at various times, even following his formal termination from Allied in November 2021. (*See* Def.'s 56.1, ECF No. 33-1, ¶¶ 63–84, 100–17; Pl.'s 56.1, ECF No. 34-1, ¶¶ 64–84, 100–17.) Specifically, the evidence indicates that, after Plaintiff's termination, Allied employees sought work for Plaintiff and provided Plaintiff with information about or offers to at least three jobs. First, on January 4, 2022, Leary, a client manager, called Plaintiff regarding a job, which call was followed by text messages between Plaintiff and Leary. (Def.'s 56.1, ECF No. 33-1, ¶¶ 102, 112.)[19] The first text, from Plaintiff, reads: "Good evening stacy, would you please provide me with all details, like the type of the business, the dress code, location, duration, FT or PT, how many hours a week, one man shift or more. Etc. Thanks." (Leary Texts, ECF No. 34-16, at ECF p. 2 (cleaned up).) This text was the first message exchanged between the two numbers in several months. (*Id*.) Leary responded with a series of texts that stated:

---

[18] The Court notes that this submission includes mostly photographs of printouts of confirmation emails, which do not appear to cover all alleged applications to Allied and some of which appear unaffiliated with Allied. (Job Appls., ECF No. 34-15, at ECF pp. 2–16.) The photos are partially illegible.

[19] Plaintiff contends that the January 4, 2022 outreach did not include a call and did not constitute a job offer. (*See* Pl.'s 56.1, ECF No. 34-1, ¶ 112 (stating in part that "Leary did not call Plaintiff, he texted him" and that "Leary never offered Plaintiff an armed guard position").) Although there are no phone records in the summary judgment record, Habib's opening text, in which he asked "stacy" for further information regarding an apparent job, corroborates Defendant's factual assertion that Mr. Leary called Plaintiff before their text correspondence started. (*See* Leary Texts, ECF No. 34-16, at ECF p. 2.)

"Commercial building," "one grand central," "Death threats to one of the tenants in building," "In need of an armed guard," and nothing else. (*Id*.) Habib responded: "I pass, I am looking for full time position. Thanks," without indicating how he learned that the position was not full time. (*Id*.)

Next, on May 14, 2022, Plaintiff texted Leary the following message: "Good evening stacey, would you please provide me with complete details, I am available for the right fit job Thanks[.]" (*Id*. at ECF p. 4.) Leary responded with information about a job at "Trinity church or St. Paul church" for four days per week of nine hour shifts at $44 per hour. (*Id*. at ECF p. 3.) Plaintiff responded: "God willing I call you tomorrow to get more details, I am very familiar with the church and the wall st. Area. Thanks." (*Id*. at ECF p. 4.) The next day, Leary texted Plaintiff, "Ok trinity church located at 89 Broadway," "Shift 10 hour shift," "8am to 6pm," "44 an hour," and asked if he was able to work that day. (*Id*.) The record contains no evidence of a response from Plaintiff. It is clear, though, that Plaintiff did not resume employment with Allied between the date he was fired and the date on which he filed this lawsuit. (*See generally* Def.'s 56.1, ECF No. 33-1, ¶ 114; Pl.'s 56.1, ECF No. 34-1.)

In summary, Allied claims that the record shows that between October 1, 2021, and May 25, 2022, they contacted Plaintiff regarding "four jobs, three of which were armed, two of which paid significantly more than Sears Brooklyn, and all of which he did not accept." (Def.'s Mem., ECF No. 33-2, at 20 (citing Def.'s 56.1, ECF No. 33-1, ¶¶ 63–84; 100–17).)

### E. Post-Termination Complaints

On November 21, 2021, after Allied terminated Plaintiff's employment, Plaintiff emailed Peter Maris ("Maris"), who was then the director of Human Resources at Allied, to raise concerns about his treatment. (Def.'s 56.1, ECF No. 33-1, ¶ 127; Pl.'s 56.1,

ECF No. 34-1, ¶ 127; Nov. 21, 2021 Email, ECF No. 33-42.) In that email, Plaintiff alleged that, since filing "complaints with the EEOC, Labor Department, and, the Civil Court," he had "been labeled a trouble maker by Allied Management." (Nov. 21, 2021 Email, ECF No. 33-42; *see also* Def.'s 56.1, ECF No. 33-1, ¶¶ 128, 130; Pl.'s 56.1, ECF No. 34-1, ¶¶ 128, 130.) Plaintiff also stated that he had been subject to harassment and retaliation and that Defendant's employees "are trying to get rid of me, for no reason." (Nov. 12, 2021 Email, ECF No. 33-42; *see also* Def.'s 56.1, ECF No. 33-1, ¶ 129; Pl.'s 56.1, ECF No. 34-1, ¶ 129.)

On May 25, 2022, Plaintiff filed the complaint in this case. (Compl., ECF No. 1.)

## DISCUSSION

### I.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). "Put another way, summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-movant." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021) (alterations and quotation marks omitted).

The movant "'bears the burden of demonstrat[ing] the absence of a genuine issue of material fact.'" *Nick's Garage, Inc.*, 875 F.3d at 114 (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 323). In cases where the non-movant bears the burden of proof at trial, "the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim." *Tardif v. City of New York*, 991 F.3d 394, 403 (2d Cir. 2021) (citing *Celotex Corp.*, 477 U.S. at 325). Once the moving party has satisfied their burden, "'the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 51 (E.D.N.Y. 2021) (emphasis in original) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). However, summary judgment must be denied "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). Further, Rule 56(c) provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *Lener v. Hempstead Pub. Sch.*, 55 F. Supp. 3d 267, 274 (E.D.N.Y. 2014).

When determining whether a movant is entitled to summary judgment, courts do not weigh the evidence or make credibility determinations to decide the truth of the

matter, but instead determine "'whether there is a genuine issue for trial.'" *Green v. Town of E. Haven*, 952 F.3d 394, 406 (2d Cir. 2020) (quoting *Anderson*, 477 U.S. at 249, 255). District courts are "required to 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). In addition, courts "may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 386 (2d Cir. 2020) (quotation marks omitted).

## II.  FLSA and NYLL Retaliation

### A.  Legal Standard

The FLSA prohibits retaliation against people who assert rights protected by the act. *See* 29 U.S.C. § 215(a)(3) (making it unlawful to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act"). "This anti-retaliation provision enforces appropriate wage and hour standards under the FLSA by ensuring that 'fear of economic retaliation' does not 'operate to induce aggrieved employees quietly to accept substandard conditions.'" *Aflalo v. Cantor Fitzgerald, L.P.*, 298 F. Supp. 3d 688, 694 (S.D.N.Y. 2018) (quoting *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)). The NYLL's anti-retaliation provision is substantially similar, and courts apply the same analysis across both statutes. *See Abe v. Yamaguchi & Friends, Inc.*, No. 22-CV-3164 (NRM) (ARL), 2024 WL 3875779, at *10 (E.D.N.Y. Aug. 20, 2024) (quoting *Li v. Chinese Nail Salon Ass'n of E. Am. Inc.*, No. 20-CV-6390 (KAM) (LB), 2024 WL 866248, at *3 (E.D.N.Y. Feb. 28, 2024)). Participation in

protected activity includes informal written and oral complaints to employers about violations of the FLSA. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011) ("[A] complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."); *see also Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 117 (2d Cir. 2015).

When considering motions for summary judgment, "courts address FLSA retaliation claims under the familiar 'burden-shifting' framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981)." *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 471 (S.D.N.Y. 2008) (citing 42 U.S.C. § 2000e *et seq.*, and *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 876 (2d Cir. 1988), among others).[20] The same approach is taken for claims brought under the NYLL. *Robinson v. De Niro*, 739 F. Supp. 3d 33, 74 n.9, 75 (S.D.N.Y. 2023); *see also Perry v. High Level Dev. Contracting & Sec. LLC*, No. 20-CV-2180 (AMD) (PK), 2022 WL 1018791, at *9 (E.D.N.Y. Mar. 16, 2022) ("Because the FLSA and NYLL retaliation provisions are nearly identical, claims under both statutes are analyzed using the same framework." (quotation marks omitted)), *report and recommendation adopted*, 2022 WL 1017753 (E.D.N.Y. Apr. 5, 2022).

Under this framework, a plaintiff has the initial burden of establishing a prima facie case of retaliation, which requires demonstrating four elements: "(1) 'an adverse employment action'; (2) 'participation in a protected activity'; (3) 'that the defendant

---

[20] Title VII cases, which can be instructive in this context, use the same test. *See Torres*, 628 F. Supp. 2d at 471.

knew of the protected activity'; and '(4) a causal connection between the protected activity and the adverse employment action.'" *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025) (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 316 (2d Cir. 2015)); *see also Williams v. Harry's Nurses Registry, Inc.*, No. 24-CV-34, 2025 WL 842041, at *3 (2d Cir. Mar. 18, 2025) (discussing *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010)) (summary order). Plaintiff's burden at the prima facie stage is minimal. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see also Hoag v. Fallsburg Cent. Sch. Dist.*, 279 F. Supp. 3d 465, 485 (S.D.N.Y. 2017) (defining Plaintiff's burden as "*de minimis . . . not non-existent*" (citations omitted)).

If Plaintiff establishes a prima facie case of retaliation, "the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013). After "an employer offers such proof, the presumption of retaliation dissipates." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).[21] In other words, "[i]f the employer produces evidence of a non-retaliatory justification for the adverse employment action, the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is pretext for retaliation." *Hoag*, 279 F. Supp. 3d at 485.

---

[21] Under the *McDonnell-Douglas* test, the Court must determine whether Plaintiff has established a prima facie case and whether Defendant has presented evidence of a legitimate reason for termination. *Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d 371, 374 (2d Cir. 2000) ("It is the judge, not the jury, who must decide whether plaintiff has satisfied the requirements of *McDonnell Douglas*'s minimal version of a prima facie case . . . as well as whether the defendant has subsequently satisfied the burden of proffering a nondiscriminatory reason for its conduct.").

**B. Analysis**

As set forth above, Plaintiff states claims under the FLSA and the NYLL alleging that Allied retaliated against him for complaining about unpaid wages informally and by filing lawsuits. (Am. Compl., ECF No. 6, ¶¶ 1–2, 107–26.) Habib alleges that Allied retaliated against him in two ways: first, by failing to assign him to a new work location after he left his position at Sears Brooklyn; and second, by terminating his employment. (*Id.* ¶¶ 113–14, 123–24; *see also* Oral Arg. Tr., ECF No. 37, at 3:6–12.)

Defendant argues that Allied is entitled to summary judgment because Habib cannot establish a prima facie case of retaliation. Defendant further argues that Habib's 2021 lawsuit does not constitute protected activity, and that Habib cannot establish a causal connection between his protected activity and either Allied's decision to fire him or its failure to rehire him. (Def.'s Mem., ECF No. 33-2, at 13–19.) In the alternative, Defendant argues that Plaintiff has presented no evidence of pretext, and thus cannot show that either Defendant's failure to find Plaintiff a new placement or that their decision to fire him was retaliation for protected activity. (*Id.* at 19–20.)

In response, Habib argues that there are genuine issues for trial as to whether he was terminated because of his protected activity, citing the timing of Plaintiff's complaints and Defendant's allegedly shifting rationales for Plaintiff's firing. (*See* Response, ECF No. 34, at 11–20.)

The Court now turns to an analysis of Plaintiff's prima facie case of retaliation, starting with a discussion of the adverse actions allegedly taken by Allied, followed by a discussion of Plaintiff's engagement in activity protected by the FLSA and NYLL, Allied's knowledge of his activity, and causation.

1. *Plaintiff's Prima Facie Retaliation Case*

    a. <u>Adverse Employment Actions</u>

As discussed above, Plaintiff argues that Defendant took two adverse employment actions against him: first, Allied failed to reassign him to a new position after he ceased working at Sears, and then Allied terminated his employment. (Am. Compl., ECF No. 6, ¶¶ 113–14, 123–24; *see also* Def.'s Mem., ECF No. 33-2, at 11.) As noted above, Defendant concedes that these actions constitute adverse employment actions. (*See* Def.'s Mem., ECF No. 33-2, at 11.) The Court therefore concludes that Plaintiff has established this element of his prima facie case.

    b. <u>Participation in Protected Activity</u>

Reviewing the allegations in the complaint and the record in the light most favorable to Plaintiff, Plaintiff alleges at least four protected activities here: his 2020 state court lawsuit, a complaint to Maris in HR after his termination in 2021, Plaintiff's November 2021 lawsuit, and informal complaints to his supervisor about wages and Allied's failure to find him a new position. Each protected activity is discussed below, with a focus on what the evidence shows regarding who at Allied knew of what protected activity. *See Littlejohn*, 795 F.3d at 316.

    i. <u>*Plaintiff's 2020 Lawsuit & Complaint to Peter Maris*</u>

Defendant concedes that Plaintiff's 2020 state lawsuit and the complaint to Peter Maris in the HR department constitute protected activity under the FLSA and NYLL. (Def.'s Mem., ECF No. 33-2, at 10–11.) As discussed above, at the time of the 2020 lawsuit, Plaintiff was supervised by Khemraj and client manager Hosain. (Def.'s 56.1, ECF No. 33-1, ¶¶ 27–28; Pl.'s 56.1, ECF No. 34-1, ¶¶ 27–28.) The summary judgment record includes testimony from Plaintiff's immediate supervisor, Tchou, who stated that he did not know of the 2020 lawsuit against Allied; Plaintiff points to no record

evidence to dispute Tchou's statement. (*See* Tchou Dep., ECF No. 33-10, at 131:4–12, 110:3–12; Pl.'s 56.1, ECF No. 34-1, ¶ 40 (neither confirming nor denying).) The summary judgment record is silent on whether Abraham, Plaintiff's direct supervisor, was aware of the 2020 lawsuit.

The Maris complaint, which Plaintiff sent on November 21, 2021, was close in time to Plaintiff's firing. (Def.'s 56.1, ECF No. 33-1, ¶ 127; Pl.'s 56.1, ECF No. 34-1, ¶ 127; Nov. 21, 2021 Email, ECF No. 33-42.) However, given that Plaintiff contacted Maris after Plaintiff was fired, he cannot establish that the Maris complaint caused his firing, although it may be considered protected activity for purposes of evaluating Plaintiff's failure to hire claim, for the period of time after Plaintiff was terminated.

## ii. *Plaintiff's 2021 State Lawsuit*

Defendant asserts that Plaintiff cannot establish that his 2021 lawsuit alleging unpaid wages constituted protected activity because, according to Defendant, Plaintiff filed that lawsuit in bad faith. (*See* Def.'s Mem., ECF No. 33-2, at 13–14.) For the reasons set forth below, the Court finds that the 2021 lawsuit constituted protected activity.

As discussed above, under the FLSA, it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint" related to the FLSA, and informal written and oral complaints are protected. 29 U.S.C. § 215(a)(3); *Kasten*, 563 U.S. at 14. While the "Second Circuit has never expressly held that the good faith, reasonable belief of the complainant is relevant to whether a complainant has engaged in protected activity under the FLSA," a finding of good faith may be required to actualize the FLSA's policy goals. *Robinson*, 739 F. Supp. 3d at 86.

To support the argument that Plaintiff filed his 2021 lawsuit in bad faith, Defendant argues that Habib had no formal complaints about unpaid wages open with

Allied at the time of filing and that he ultimately withdrew the 2021 lawsuit. (Def.'s Mem., ECF No. 33-2, at 13–14; *see also* Def.'s 56.1, ECF No. 33-1, ¶¶ 97, 24.) The record indicates, however, that Plaintiff believed (albeit incorrectly) that Allied owed him money when he filed the 2021 state lawsuit. (*See* Habib Dep., ECF No. 33-4, at 40:15–20.)

Defendant presents scant evidence to rebut Plaintiff's testimony under oath that he was motivated, at least in part, to file the 2021 lawsuit because he believed Defendant owed him wages in 2021. Defendant argues that Plaintiff was actually motivated by a sense of persecution, but that argument makes selective use of the record. (*Compare* Def.'s Mem., ECF No. 33-2, at 14 (noting that Habib testified he filed the 2021 lawsuit *in part* because he believed he was blacklisted) *with* Habib Dep., ECF No. 33-4, at 40:16–20 (describing his reasons for filing the lawsuit as "one is the money the company owe me and the second one it was retaliation against me").) The Court finds that Plaintiff's decision to withdraw the lawsuit upon learning that Defendant did not owe him money is not, without more, a basis for a finding of bad faith. (*See* Def.'s 56.1, ECF No. 33-1, ¶ 22; Pl.'s 56.1, ECF No. 34-1, ¶ 22.) *Cf. Robinson*, 739 F. Supp. 3d at 88 (finding no bad faith in part because "the evidence indicates that Plaintiff's NYLL and FLSA claims were plausible and had a basis in law and fact, even if unlikely to prevail").)

There is no dispute that the 2021 lawsuit raised unpaid wage claims against Allied. (*See* 2021 Lawsuit, ECF No. 34-12 (naming Allied Universal as the defendant and stating a claim for $25,000 in unpaid wages).) Unpaid wage claims in lawsuits like Plaintiff's clearly assert rights protected under the FLSA. *See Greathouse*, 784 F.3d at 117. In the absence of clear evidence that the November 2021 lawsuit was subjectively brought in bad faith, the Court finds that the 2021 lawsuit should be considered protected activity under the FLSA and the NYLL.

30

As to timing and who knew about the 2021 lawsuit, the state court case was filed on November 12, 2021, and Allied received service of the complaint on November 15, 2021. (Def.'s 56.1, ECF No. 33-1, ¶¶ 85, 90; Pl.'s 56.1, ECF No. 34-1, ¶¶ 85, 90.) Tchou and Johnson knew of the lawsuit by no later than November 15, 2021, when they exchanged emails about it. (*See* Def.'s 56.1, ECF No. 33-1, ¶¶ 90 (describing service), 91 (describing email from Tchou to Johnson about lawsuit); *see also* Pl.'s 56.1, ECF No. 34-1, ¶ 91; Texts between Abraham and Plaintiff, ECF No. 33-6, at ECF p. 2 (evidencing text from Plaintiff to Abraham stating, "As I promised you, this is one of 2 lawsuit against Allied universal . . . .").) The summary judgment record does not shed light on who else at Allied knew about the 2021 suit.

### iii.    *Informal Complaints*

Plaintiff contends that his employment with Allied was "studded with complaints and lawsuits concerning unpaid wages," and that Plaintiff complained to his direct supervisor about unpaid wages shortly before filing the lawsuit. (Response, ECF No. 34, at 10 (citing Khemraj Texts, ECF No. 34-7; 2016 Lawsuit, ECF No. 34-8; 2020 Lawsuit, ECF No. 34-9; 2021 Lawsuit, ECF No. 34-12; Abraham Screenshots, ECF No. 34-10).) As detailed above, Plaintiff made various complaints to his supervisors about unpaid wages. As to who received or knew about these complaints, the record on summary judgment illustrates that most of Plaintiff's complaints were directed at his former supervisor, Khemraj, between May 2016 and May 2021. (Def.'s 56.1, ECF No. 33-1, ¶ 13; Pl.'s 56.1, ECF No. 34-1, ¶ 13 (complaining of payroll errors).) As discussed above, Khemraj left Allied in May 2021, months before the events of this case. (Def.'s 56.1, ECF No. 33-1, ¶¶ 34–36; Pl.'s 56.1, ECF No. 34-1, ¶¶ 35–37.)

Plaintiff also testified that he complained to Abraham about unpaid wages regularly, but the record lacks granular detail as to the frequency, format, or content of

these alleged complaints other than the June 2021 complaint, which was promptly resolved, as discussed *supra*, and the November 5, 2021 inquiry to Abraham about receiving vacation pay. (*See* Habib Dep., ECF No. 33-4, at 109:2–18, 110:14–20; *see also* Abraham Screenshots, ECF No. 34-10, at ECF p. 3.) Notwithstanding the relatively thin evidence concerning the specifics of Plaintiff's informal complaints to Abraham, the Court does find that Plaintiff's informal complaints should be considered protected activity for purposes of the summary judgment analysis.

      c.  <u>Defendant's Knowledge of Protected Activity</u>

To establish knowledge on behalf of a corporate defendant, "for purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of h[is] protected activity to establish the knowledge prong of the prima facie case." *Zann Kwan*, 737 F.3d at 844 (quoting *Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)). As discussed above, various of Allied's employees received information about Plaintiff's engagement in protected activities. As the Second Circuit has made plain in the Title VII context, knowledge held by a corporation's employees is "sufficient to impute . . . general corporate knowledge of the plaintiff's protected activity." *Id.* Applying that standard here, the Court finds that Defendant had knowledge of Plaintiff's protected activity.

      d.  <u>Causation</u>

The Court next turns to the final element of Plaintiff's prima facie case, causation, and evaluates each of the alleged employment actions in turn, with an examination of how the adverse employment action came to pass. To establish causation, Plaintiff must show "that it is more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir.

2010), *abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

The Second Circuit recently emphasized that plaintiffs alleging retaliation "'usually must rely on bits and pieces of information to support an inference of discrimination [or retaliation].'" *Edelman*, 141 F.4th at 49 (alteration in original) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 73, 86 (2d Cir. 2015)). It is also well settled that a jury may "base its verdict wholly on reliable inferences deduced from circumstantial evidence.'" *Id.* (quoting *United States v. Brown*, 937 F.2d 32, 36 (2d Cir. 1991)). Accordingly, the *Edelman* court reiterated that "summary judgment in favor of an employer on th[e causation] prong should be granted only sparingly 'because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination [or retaliation].'" *Id.* (alteration in original) (quoting *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 124 (2d Cir. 2005)).

In some cases, "temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). Notably, the circuit has "'not drawn a bright line'" defining "'the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.'" *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)). Rather, courts are permitted to "'exercise . . . judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases.'" *Id.* (quoting *Espinal*, 558 F.3d at 129); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93,

110 (2d Cir. 2010).[22] "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

There are unfortunate gaps in the summary judgment record as to who knew what and when, and who took what actions with respect to each of Plaintiff's alleged adverse employment actions. As detailed below, it is not clear that, based on this record, a jury could reasonably conclude that retaliatory animus motivated either Allied's failure to place Plaintiff in a new position or the decision to terminate his employment. *Edelman*, 141 F.4th at 48. However, in light of both the Second Circuit's clear guidance that even minimal circumstantial evidence may support an inference of retaliatory intent, the Court respectfully recommends that causation be found for purposes of the analysis on summary judgment.

### i.   *Retaliatory Failure to Transfer Plaintiff to or Hire Him for a New Position*

As to his first theory, Plaintiff alleges that Allied retaliated against him by failing to place him in a new position after he left his job at Sears, both before and after his termination. (*See* Response, ECF No. 34, at 3–5; *see also* Oral Arg. Tr., ECF No. 37, at 65:6–71:13 (discussing facts relevant to the failure to rehire theory).) In the absence of affirmative retaliatory animus in the record, Plaintiff argues that the Court may infer unlawful retaliation because Allied never invited him to interview for a new job. (*See* Oral Arg. Tr., ECF No. 37, at 67:2–4 (positing that the evidence supports a finding of retaliation because "there's an inference here of retaliation because he wasn't

---

[22] The Second Circuit has held that adverse action three to eight months after protected activity can establish causation in a prima facie case if the allegedly retaliatory action occurred at the first available opportunity. *See Summa*, 708 F.3d at 128; *Espinal*, 558 F.3d at 129.

interviewed for any job"), 68:10–11 ("I just know that he was never interviewed. Why would that be?"), 68:16–22 (arguing that a "jury could find with a gap in the evidence there's an inference of retaliation").) Plaintiff also contends that although he did not formally apply for any jobs before his employment was terminated, his outreach to managers constituted "applying." (*Id.* at 29:19–25.)

As set forth above, the summary judgment record shows that Plaintiff did not formally apply for any jobs at Allied prior to his termination. And even though Plaintiff has adduced some evidence to illustrate that he applied for jobs at Allied, the record is devoid of evidence of what happened to Plaintiff's job applications and *who* at Allied declined to hire him. Construing all evidence and arguments in the light most favorable to Plaintiff, the Court considers Plaintiff's retaliation claim to cover the entire period from October 2021 to May 25, 2022, when this lawsuit was filed.

### *Pre-Termination Failure to Transfer or Hire*

As discussed above, Plaintiff was notified of his termination on November 19, 2021, and he does not offer any evidence to establish that he applied to any jobs at Allied between leaving his position at Sears and being fired. (*See* Def.'s 56.1, ECF No. 33-1, ¶ 118; Pl.'s 56.1, ECF No. 34-1, ¶ 118; Oral Arg. Tr., ECF No. 37, at 30:8–11.) It is undisputed that Plaintiff did ask his supervisors to look for work on his behalf. (*See, e.g.*, Def.'s 56.1, ECF No. 33-1, ¶ 76; Pl.'s 56.1, ECF No. 34-1, ¶ 76.) Plaintiff also does not dispute that reassignment was discretionary. (Pl.'s 56.1, ECF No. 34-1, ¶ 56.)

As detailed above, the summary judgment record demonstrates that various Allied managers, including his direct supervisors, made some efforts to locate work for Plaintiff, but that, aside from the position Plaintiff had left at Sears, there were no armed guard positions in Tchou's book of business at the time. (Def.'s 56.1, ECF No. 34-1, ¶ 84;

*see* Pl.'s 56.1, ECF No. 34-1, ¶ 84; *see also* Def.'s 56.1, ECF No. 33-1, ¶¶ 64–83, 98; Pl.'s 56.1, ECF No. 34-1, ¶¶ 63–83, 98 (denying this fact without providing evidence to the contrary).) The non-armed positions paid less, and when Abraham provided information about a non-armed fill-in position at T-Mobile, Habib turned down the opportunity and asked Abraham to send "[E]qual work or better." (*See* Def.'s 56.1, ECF No. 33-1, ¶¶ 77–81; Pl.'s 56.1, ECF No. 34-1, ¶¶ 77–81.) Abraham responded, in essence, that he was trying to help and would not text Plaintiff again. (Def.'s 56.1, ECF No. 33-1, ¶ 81; Pl.'s 56.1, ECF No. 34-1, ¶ 81.)

Reviewing the summary judgment record as a whole, there is no affirmative evidence illustrating that retaliatory animus or "blacklisting" prevented his supervisors, Tchou and Abraham, from working to find Plaintiff a new position at Allied. As to whether any other Allied managers could have placed Plaintiff into a new position prior to his termination, the record does not establish that any appropriate positions existed in the time period from late October to mid-November 2021, that Plaintiff applied for them, or that the other managers knew of his engagement in any protected activity under the FLSA and NYLL. Given the specific facts in the record regarding Allied's lack of centralized hiring and the lack of available opportunities within his direct supervisors' control, the Court questions whether Plaintiff has adduced sufficient evidence that could lead a reasonable fact finder to conclude that Allied's collective failure to transfer or hire Plaintiff for a different full-time job at the company between October 25, 2021, and November 20, 2021, resulted from retaliation.

### *Post-Termination Failure to Hire*

The Court also finds that the summary judgment record is thin on evidence of retaliatory causation with respect to Allied's failure to hire Plaintiff post-termination. Specifically, as set forth below, there is no evidence in the record to show that Plaintiff's

applications were rejected, or even reviewed by, any Allied employees who had knowledge of any aspect of his protected activity.

Plaintiff claims that, after he was fired, he applied to 12 jobs at Allied and argues that the fact that he got no interviews is sufficient to infer retaliation. (*See* Pl.'s 56.1, ECF No. 34-1, ¶ 84 ("Plaintiff applied for fifty-seven ( [sic] armed security guard between 12/1/21 and 4/5/2023, twelve of these jobs being at Allied, throughout the 5 Boroughs and Long Island."); Oral Arg. Tr., ECF No. 37, at 30:8–11.) As noted above, Plaintiff provides only pieces of information about those applications. (*See* Job Appls., ECF No. 34-15, at ECF pp. 17–20 (listing 51 job applications apparently submitted between October 31, 2021, and April 5, 2023, including prospective employer and date of application, without indicating who compiled such information or on what basis); *id*. at ECF pp. 2–16 (providing partially illegible photos of printed application confirmations to Allied and other potential employers).) There is no evidence to establish that any of these jobs were in Tchou's book of business, or that the jobs were still available when Plaintiff applied. There is also no evidence as to who, if anyone, at Allied reviewed Plaintiff's applications or that any such Allied employees knew of Plaintiff's protected activity. (*See* Oral Arg. Tr., ECF No. 37, at 65:6–66:22.) Rather, as discussed above, the record shows that Plaintiff applied for various positions through a bot, and did not receive any interviews or offers in response. No party has advanced any evidence that explains what happened to Plaintiff's applications after they were submitted via the bot.

Notwithstanding Plaintiff's lack of success in applying for jobs through the bot, there can be no serious dispute that Allied employees contacted Plaintiff regarding possible jobs at Allied at least twice after he was terminated: in January 2022 and in May 2022. (*See* Def.'s 56.1, ECF No. 33-4, ¶¶ 111–15; Pl.'s 56.1, ECF No. 34-1, ¶¶ 112–15; Leary Texts, ECF No. 34-16 (including texts regarding work opportunities in January

2022, and May 2022, and a June 24, 2022 text from Leary that states, "Are you able to work today," to which Plaintiff did not respond); Habib Dep., ECF No. 33-4, at 59:9–60:15.)[23] Defendant also claims that Allied employees continued to make efforts to find Plaintiff jobs in November and December of 2021 as well. (Def.'s 56.1, ECF No. 33-1, ¶¶ 110–11.)

Plaintiff contends that none of this outreach constituted genuine job offers because Plaintiff did not receive a "'Job Offer/Transfer Acknowledgement' form." (Pl.'s 56.1, ECF No. 34-1, at ECF p. 28, ¶¶ 74–75.[24]) Defendant disagrees, proffering evidence that Plaintiff's position mischaracterizes how Allied uses that particular form. Defendant has submitted evidence from a representative from Allied, who testified that a "'Job/Offer Transfer Acknowledgement form' is utilized in the process of presenting active employees with a transfer. It is not used to hire or rehire employees." (Lorberbaum Decl., ECF No. 35-1, ¶ 5.) At oral argument, Plaintiff conceded that no evidence in the summary judgment record refutes Defendant's evidence regarding Allied's use of this form. (*See* Oral Arg. Tr., ECF No. 37, at 7:23–12:2, 12:8–13:13.)

Plaintiff also argues that these offers should not be considered because Allied and counsel were in pre-litigation discussions as of mid-May 2022, and that any outreach to Plaintiff should have been made through counsel. (Pl.'s 56.1, ECF No. 34-1, ¶¶ 113–15, 117.) Plaintiff also seeks sanctions for this allegedly improper behavior. Plaintiff does not, however, rebut Defendant's clear evidence of these efforts to offer

---

[23] Neither party indicates whether any of these job offers were connected to the 12 applications Plaintiff submitted to Allied.

[24] This claim appears in the portion at the end of Plaintiff's 56.1 statement, rather than the responsive portion of his 56.1 statement.

him a position with any admissible evidence and Plaintiff's arguments that this

evidence should be discounted or that sanctions are warranted are unavailing. (*See id.*)[25]

\* \* \* \* \*

As to whether Allied retaliated against Plaintiff by failing to find him a new

position both before and after his termination, the evidence in the summary judgment

record indicates that Allied employees did, in fact, contact Plaintiff with job offers,

---

[25] Plaintiff contends that Leary's outreach in mid-May and June 2022 did not include any legitimate job offers in part because Plaintiff was represented by counsel in this lawsuit at the time. (*See* Oral Arg. Tr., ECF No. 37, at 43:21–45:11.) Plaintiff also seeks sanctions against Defendant for this outreach. (*See id.* at 24:12–27:2; Response, ECF No. 34, at 15–19; Pl.'s 56.1, ECF No. 34-1, ¶¶ 113–15, 117.) In response, Defendant argues that Leary's contacts with Plaintiff were not improper: in part due to Allied's size and corporate structure, counsel argues that Leary was not likely aware of this lawsuit when he reached out to Plaintiff. (Oral Arg. Tr., ECF No. 37, at 47:3–11.) In addition, as noted at oral argument, during this time, Plaintiff was submitting applications to Allied directly, not through counsel. (*See id.* at 47:11–48:13; *see also* Job Appls., ECF No. 34-15, at ECF pp. 17–20 (listing applications to Allied between 11/30/21 and 2/15/23, including an application on 1/16/22).) The Court notes that Leary's texts to Plaintiff in mid-May predate the filing of this lawsuit but that the one in June clearly post-dates the filing of this case. Although Plaintiff is correct that Allied itself was on notice of the lawsuit in early May 2022, Plaintiff has not offered evidence or authority to support the conclusion that Plaintiff's representation somehow nullifies the relevance of a job offer from Allied. (*See* Oral Arg. Tr., ECF No. 37, at 26:14–27:1.)

In support of the argument that this contact was improper, Plaintiff's counsel offers three case examples, *Dosso v. Knights Collision Experts, Inc., et al.*, No. 20-CV-461 (EK) (CLP), *Saravia v. Royal Guard Fence Co.*, No. 19-CV-2086 (SIL), and *Shuler v. Liberty Consulting Services, Ltd.*, No. 20-CV-5779 (KAM) (CLP). (*See* Response, ECF No. 34, at 18–19; Pl.'s 56.1, ECF No. 34-1, ¶¶ 113–15, 117.) Having reviewed the dockets for each of these cases, the Court finds that none of these cases are apposite — all three of these cases concern improper efforts to enter into monetary settlements in an effort to evade *Cheeks* review, a very different scenario than what we have here: a text mentioning an available job to an individual who previously had a long term relationship with Allied and who was applying for jobs at the company. *See generally Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015); *see Dosso*, No. 20-CV-461, ECF Nos. 22 & 33; *Saravia*, No. 19-CV-2086, ECF No. 41; *Shuler*, No. 20-CV-5779, ECF No. 24 & May 2, 2022 ECF Order Adopting R. & R. Moreover, nothing in Leary's texts makes reference to or implies any efforts to settle this case. Finally, Plaintiff's counsel has cited no authority, and the Court is not aware of any, that render it improper for a company to extend an employment offer to someone who has been applying for positions at their company even though they may also have counsel in connection with an employment matter related to that company. Accordingly, the Court declines to recommend that sanctions be entered against Defendant on the basis of this outreach and the Court does not find Plaintiff's argument that these texts were not actual offers to be compelling.

which undercuts Plaintiff's theory that Allied had blacklisted him overall.[26] But the evidence in the record is quite undeveloped as to what jobs were truly available and what happened to Plaintiff's applications after he applied through the bot. The evidence is similarly undeveloped as to what, if any, actions Allied employees took in response to Plaintiff's applications and whether any of the people who reviewed them (if they were, in fact, reviewed by people) had knowledge of Plaintiff's protected activity. Given the inherent challenges in developing evidence of retaliation, however, and notwithstanding these gaps in the evidentiary record, the Court assumes *arguendo*, for purposes of this motion only, that Plaintiff has established causation with regard to this aspect of his claim. *See Edelman*, 141 F. 4th at 49.

     *ii.*  <u>Retaliatory Termination</u>

     As to his second theory, that his firing was retaliatory, Plaintiff contends that the timing of his 2021 lawsuit — which was filed just days before his ultimate firing — should lead to an inference of retaliation. (*See* Response, ECF No. 34, at 19–20; *see also* Def.'s Mem., ECF No. 33-2, at 18 (citing Def.'s 56.1, ECF No. 33-1, ¶¶ 90, 118).)[27]

---

[26] No affirmative evidence in the record indicates that any Allied employee "blacklisted" Plaintiff or that Allied employees even harbored negative sentiments about him. (*See, e.g.*, Pl.'s 56.1, ECF No. 34-1, ¶ 26 (responding by alleging that employees were "ghosting" him, without providing evidence of negative remarks or sentiments); *cf.* Tchou Dep., ECF No. 33-10, at 38:14–17 ("Q. What do you know about Plaintiff's job performance? A. All I know is that he did well and that the clients at the time [Sears] liked him."); *see also* Oral Arg. Tr., ECF No. 37, at 32:1–36:7.) Defendant further posits "the discovery record contains no negative remarks [about] Plaintiff as a result of" his complaints about unpaid wages. (Def.'s 56.1, ECF No. 33-1, ¶ 26.)

[27] The summary judgment record does not support a finding that the other lawsuits, standing alone, would be sufficient to support an inference of causation. The 2016 and 2020 lawsuits did not take place close enough in time to the adverse employment actions alleged here to support an inference of causation without additional evidence and it is very unclear that any of Plaintiff's supervisors in 2021 had sufficient knowledge of these prior suits to be on notice that they concerned activity protected by the FLSA and the NYLL. Habib brought the 2016 lawsuit against another company, many years before this dispute arose. (*See* Def.'s 56.1,

There is no dispute that Defendant notified Plaintiff on November 19, 2021, that his employment was being terminated. (Def.'s 56.1, ECF No. 33-1, ¶ 118; Pl.'s 56.1, ECF No. 34-1, ¶ 118; Def.'s Mem., ECF No. 33-2, at 18; 2021 Lawsuit, ECF No. 34-12, at ECF p. 3.) Alone, the incredibly close timing here would raise a presumption of causation in most circumstances at this stage. In this case, however, the evidence shows that Plaintiff's departure from his job at Sears occurred several weeks before Plaintiff filed the November 2021 lawsuit. (*See* Def.'s 56.1, ECF No. 33-1, ¶¶ 70–72; Pl.'s 56.1, ECF No. 34-1, ¶¶ 70–72; Habib Dep., ECF No. 33-4, at 115:25–116:6.)

And after Plaintiff left Sears, it is undisputed that he remained without a job with an Allied client for weeks. Internal communications from around the time that Plaintiff was notified of his termination state that Plaintiff's employment was terminated because of Allied's policy. (Def.'s 56.1, ECF No. 33-1, ¶¶ 118–20; Pl.'s 56.1, ECF No. 34-1, ¶¶ 118–20 (citing Nov. 19, 2021 Email, ECF No. 33-41 (including an email, sent at 1:55 p.m., from Tchou to Johnson indicating that Tchou had sent Plaintiff a text that morning telling Plaintiff that he would be separated from the company for inactivity, but that he was eligible to be re-hired).) Moreover, Plaintiff was notified regarding his termination the same day that his name appeared in a "No Hours Report," which indicated that Plaintiff had not worked in over 21 days and noting that, absent a "valid reason," he would be "automatically terminated" at the end of the month. (Def.'s 56.1, ECF No. 33-

---

ECF No. 33-1, ¶¶ 10–12; Pl.'s 56.1, ECF No. 34-1, ¶¶ 10–12.) The 2020 lawsuit occurred more than a year and nine months in advance of Habib's termination date, when Habib worked under different supervisors. (*See* Def.'s 56.1, ECF No. 33-1, ¶¶ 20–21, 118; Pl.'s 56.1, ECF No. 34-1, ¶¶ 20–21, 118.) Especially given that Plaintiff indicates no retaliation shortly after the previous lawsuits, the Court declines to infer causation merely from these attenuated events. *See Summa*, 708 F.3d at 128. The Court does recognize, however, that these lawsuits, taken together with the 2021 lawsuit and informal written and oral complaints, create a pattern of protected activity that could, cumulatively, form the basis for a retaliation claim if supported by evidence of retaliatory animus.

1, ¶¶ 121–23 (citing Nov. 19, 2021 Email, ECF No. 33-43 (including an email sent by Senior Vice President Kelly Dunmore ("Dunmore") at 2:21 p.m., that circulated the No Hours Report)); Lorberbaum Decl., ECF No. 33-26, ¶ 25); Pl.'s 56.1, ECF No. 34-1, ¶¶ 121–23.) The evidence shows that the "No Hours Report" was automatically generated and sent by Dunmore, and there is no evidence in the record that she had any knowledge of any of Plaintiff's protected activity. (*See* Def.'s 56.1, ECF No. 33-1,¶¶ 121, 123.)[28]

In other words, the evidence in the summary judgment record, reviewed as a whole, demonstrates that Plaintiff's firing flowed from his decision to stop working at Sears in October of 2021, which predated his 2021 lawsuit, and that his October 25, 2021 decision set into motion the chain of events that led to his firing. As the Second Circuit has observed:

> Although the application of pre-existing disciplinary policies to a plaintiff without more, does not constitute adverse employment action, a causal connection between an adverse action and a plaintiff's protected activity may be established through evidence of retaliatory animus directed against a plaintiff by the defendant or by showing that the protected activity was closely followed in time by the adverse action.

*Mullins*, 626 F.3d at 53 (citations and quotation marks omitted); *cf. Slattery*, 248 F.3d at 95. Since Plaintiff stopped working at Sears "well before the plaintiff" filed his 2021

---

[28] The Court notes that although Tchou's email was sent to Johnson before Dunmore circulated the No Hours Report, both documents illustrate that these Allied managers concluded that Habib was to be terminated due to his inactivity. There is no evidence in the record that Tchou, Abraham, or any other person with knowledge of Plaintiff's protected activity coordinated with Senior Vice President Dunmore or that she knew about Plaintiff's protected activity. Accordingly, taken together, the evidence suggests that two independent decisionmakers at the company concluded that application of Allied's policy warranted Plaintiff's termination due to his period of inactivity following his departure from Sears.

state lawsuit, "an inference of retaliation does not arise" due to the timing of the 2021 lawsuit alone. *Slattery*, 248 F.3d at 95.[29]

Plaintiff also argues that his written complaints to Abraham in June 2021 and November 2021, as well as his oral complaints to Abraham, were proximate to his firing and should lead to a presumption of causation at this stage. Specifically, Plaintiff claims that he complained to Abraham about unpaid wages regularly, including in writing, in June of 2021 and again in November of 2021. (Habib Aff., ECF No. 34-3, ¶ 18 (citing Abraham Screenshots, ECF No. 34-10).) First, on June 22, 2021, Plaintiff complained that his paycheck was short. (Abraham Screenshots, ECF No. 34-10, ECF p. 6.) As set forth above, Abraham responded within two minutes, stating that the wages Habib pointed out were missing were being paid by a separate check. (*Id.*) Second, on July 22, 2021, Plaintiff texted Abraham to request that "from now forward all communication has to be [d]ocumented," indicating that all subsequent complaints to Abraham would be in writing. (*Id.* at 5.) Then, on November 5, 2021, Plaintiff texted Abraham saying, "Good morning abraham, I would like to get paid for a week vacation, also do you have a job for me? I didn't hear from you since October 26. Thanks." (*Id.* at ECF p. 3.)

The Court finds that the June 2021 written complaint is insufficient to create a presumption of causation merely based on timing alone, while the November 2021 text

---

[29] The Court notes that the former employee in *Slattery* was allegedly fired for poor performance. *Slattery*, 248 F.3d at 90. There, "the adverse employment actions were both part, and the ultimate product, of an extensive period of progressive discipline." *Slattery*, 248 F.3d at 95 (quotation marks omitted). Here, as discussed above, there is no evidence that Habib was subject to discipline or even internal criticism related to his job performance. However, the fact that Habib was performing his job satisfactorily is irrelevant to the temporal proximity analysis here, because Defendant does not claim that Habib was fired for poor performance, but rather because he left his position at Sears and then, after being without work for 21 days, was subject to automatic termination, as discussed above. *Slattery* involves a different set of facts, but the framework still applies: the actions that brought about Plaintiff's firing — his decision to leave his job at Sears — began before he filed his 2021 lawsuit.

messages, which request a week of vacation pay on November 5, and then later posit that what the company was doing was against the law and mention a lawsuit, do not clearly mention any unpaid wage complaints or what law Plaintiff believed Allied was violating. (*Id*. at 2–3.) The June 2021 complaint, sent via text message, occurred almost five months before Plaintiff was notified regarding his termination, and the pay issue Plaintiff identified was promptly resolved. Accordingly, the Court finds that the June 2021 written complaint is too attenuated to create a presumption of causation based on timing alone. *Cf. Summa*, 708 F.3d at 128; *Espinal*, 558 F.3d at 129. The November 2021 text messages were certainly proximate to Plaintiff's firing, but the only reference to wages asks for "vacation" pay, and it is somewhat unclear whether the content of the texts is sufficient to put Defendant on notice that Plaintiff was engaging in protected activity. (Abraham Screenshots, ECF No. 34-10, at ECF pp. 2–3.)[30]

Plaintiff has also adduced some evidence that he made verbal complaints to Abraham about unpaid wages before he was terminated; he stated during his deposition that he complained to his direct supervisors repeatedly throughout his employment. (Habib Dep., ECF No. 33-4, at 109:2–18, 110:14–20.)[31] While the text messages themselves indicate that Plaintiff requested that Abraham contact him only in writing beginning in July 2021, Plaintiff nevertheless claims he made oral complaints, but does not identify any specific details regarding them, describe any such instances in

---

[30] As discussed below, the FLSA does not cover claims for vacation pay. *Arjumand v. Laguardia Assocs., L.P.*, No. 14-CV-4618 (WFK) (RLM), 2015 WL 1470470, at *5 (E.D.N.Y. Mar. 30, 2015).

[31] During his deposition, Plaintiff stated that he produced dozens of pages of text messages between Plaintiff and his supervisors. (*See* Habib Dep., ECF No. 33-4, at 99:23–102:5.) If true, it appears that not all of these text messages were included in the summary judgment record.

his declaration, or provide any phone records illustrating that they were in phone contact. Even taking the evidence in the light most favorable to Plaintiff, the Court finds that there is thin evidence that Plaintiff made oral complaints to Abraham that qualify as protected activity.

In an abundance of caution, however, the Court will assume *arguendo* that all of Plaintiff's complaints — written and oral — constituted protected activity when evaluated cumulatively. Given the timing and volume of complaints here, the Court declines to view each complaint in isolation, and concludes that Plaintiff has shown that he was engaged in a pattern of protected activity that was sufficiently proximate to the alleged adverse actions so as to establish causation for Plaintiff's prima facie retaliation case. The burden now shifts to Defendant to establish a "legitimate, non-retaliatory reason" for the decision to fire Plaintiff. *Zann Kwan*, 737 F.3d at 845.

2. *Defendant's Justification*

As discussed above, to rebut Plaintiff's retaliation claims, Defendant advances similar arguments to those discussed in the analysis of whether Plaintiff has proven causation. Specifically, Defendant argues that Plaintiff was offered work following his departure from Sears, that Allied's transfer policy does not require the company to place employees who leave a posting with a new client, and that Plaintiff's failure to find new work within three weeks of leaving Sears was what led to his termination.

As discussed *supra*, Plaintiff's case is premised, at least in part, on the theory that Allied was obligated to find him equal or better work after he left his position at Sears. (*See* Def.'s 56.1, ECF No. 33-1, ¶ 80; Pl.'s 56.1, ECF No. 34-1, ¶ 80; Khemraj Texts, ECF No. 34-7; *see also* Response, ECF No. 34, at 19–20 (arguing that because Allied never provided Habib with a formal transfer offer, the 21-day termination rule did not apply).) The summary judgment record, however, clearly demonstrates that Allied was

not under an obligation to guarantee Plaintiff a new assignment after he stopped working at Sears. (*See* AU Work Assignments and Transfers Policy, ECF No. 33-12; Johnson Dep., ECF No. 33-13, at 26:5–14.)

Rather, Allied's policy states that when an employee leaves a post with a client, the company will make "reasonable efforts" to find employees seeking a transfer a new posting, but does not guarantee that those efforts will succeed. (*See* AU Work Assignments and Transfers Policy, ECF No. 33-12.) Allied's written policy also does not guarantee employees who leave a site that they will obtain a transfer of equal or higher pay or prestige; rather, the policy makes clear that "pay rates and schedules vary from assignment to assignment," so "depending on individual customer contracts, the company may not be able to offer you a position at the same pay rate, benefits or schedule." (*Id*.)

The policy further provides that if an employee seeking a new position "refuse[s] to accept available work after three (3) offers or three (3) weeks of being on 'active but not working' status (whichever comes first)," the employee "will be considered to have voluntarily resigned [their] employment due to [their] failure to accept available work." (*Id*.) Further, "[t]ransfer requests to a different Branch location in the company may be considered, but are not guaranteed." (*Id*.) In short, Defendant's policy indicates that the company will seek reassignments for employees who wish to transfer away from a particular client site, but that reassignment is not guaranteed, and that employees who have chosen not to accept "available work" three times or are without work for three weeks or more will be terminated from the company. (*Id*.)

As a result of Habib's decision to stop working at Sears, "at the time that Allied Universal received the [2021] lawsuit, Plaintiff had not worked in three weeks, had no open offers, and was already on track to be separated." (Def.'s Mem., ECF No. 33, at 18.)

Indeed, as discussed above, the same day Plaintiff was notified of his termination, Senior Vice President Dunmore circulated a monthly email to Allied managers that contained a "No Hours Report," indicating that Plaintiff had not worked in over three weeks and noting that, absent a "valid reason," he would be "automatically terminated" at the end of the month. (Def.'s 56.1, ECF No. 33-1, ¶¶ 121–23 (quoting Nov. 19, 2021 Email, ECF No. 33-43, and citing Lorberbaum Decl., ECF No. 33-26, ¶ 25 ("'No Hours Reports' are circulated every month and include employees who have not worked for the company in 21 days."); Pl.'s 56.1, ECF No. 34-1, ¶¶ 121–23.) Accordingly, all of Allied's internal communications and documents, and the text Tchou sent to Habib notifying him of his termination, indicated that Plaintiff was fired because he had been without work for more than 21 days. (Def.'s 56.1, ECF No. 33-1, ¶¶ 118–20; Pl.'s 56.1, ECF No. 34-1, ¶¶ 118–20; Nov. 19, 2021 Email, ECF No. 33-41.)[32] No evidence indicates that Dunmore knew of Habib's protected activity. (*See* Def.'s 56.1, ECF No. 33-1, ¶¶ 121, 123; Oral Arg. Tr., ECF No. 37, at 15:21–24.) Plaintiff does not, and cannot, seriously contest that Defendant's policy calls for terminating employees who have not worked for three weeks or more, or that he was without work for more than three weeks. (Habib Decl., ECF No. 34-3, ¶ 66 (detailing policy); *but see id.* ¶ 68 (stating that he applied for positions but "Allied made sure" he was without work for three weeks).)

---

[32] As noted above, on November 20, 2021, Abraham completed an internal "Personnel Action Notice," terminating Habib's employment and listing him as "eligible for rehire." (Def.'s 56.1, ECF No. 33-1, ¶¶ 124–26; Pl.'s 56.1, ECF No. 34-1, ¶¶ 124–26; PAN Separation Document, ECF No. 34-13 (listing rationale).) Under "reason," the form states that Plaintiff "Resigned — Refused Work." (PAN Separation Document, ECF No. 34-13.) The Court finds this rationale is consistent with all of the other evidence offered as Allied's justification for Plaintiff's termination.

The Court finds that the evidence is clear that Allied's written policy did not obligate the company to find Plaintiff a new position when he sought one in late 2021. The Court also finds that Defendant's written policy mandated Plaintiff's firing, and that his inclusion in the No Hours Report illustrates that his separation from the company by the end of November 2021 was almost certainly inevitable, even taking his immediate supervisors' actions out of the equation. The Court therefore recommends finding that Allied has provided legitimate, non-retaliatory reasons for not finding Plaintiff a new position and for his termination. Accordingly, Allied has rebutted Plaintiff's prima facie case, and the "presumption of retaliation dissipates," *Jute*, 420 F.3d at 173. Plaintiff now "must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is pretext for retaliation." *Hoag*, 279 F. Supp. 3d at 485.

3. *Plaintiff's Proof of Pretext*

Since Defendant has provided a legitimate, non-discriminatory reason for its inability to place Plaintiff in a new position and for Plaintiff's termination, "[s]ummary judgment is appropriate" unless Plaintiff can demonstrate that the non-discriminatory rationale is pretextual. *Tubo v. Orange Reg'l Med. Ctr.*, 690 F. App'x 736, 738 (2d Cir. 2017) (quotation marks omitted). To rebut a defendant's showing of a non-pretextual reason for an adverse employment action, the plaintiff must show, at a minimum, "that it is more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate." *Fox v. Starbucks Corp.*, No. 21-2531, 2023 WL 407493, at *1 (2d Cir.

Jan. 26, 2023) (quotation marks omitted).[33] To make this showing, the plaintiff "may rely on evidence comprising [their] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations." *Giscombe v. New York City Dep't of Educ.*, 39 F. Supp. 3d 396, 403 (S.D.N.Y. 2014) (quoting *Zann Kwan*, 737 F.3d at 847).

The Second Circuit has made clear that once a defendant has proffered a legitimate reason for the alleged adverse employment action, temporal proximity alone generally cannot establish pretext. *El Sayed*, 627 F.3d at 933 (stating that "temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation," but alone, "such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext"). However, plaintiffs can point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons that would raise doubt in the factfinder's mind that the employer did not act for those reasons." *Giscombe,* 39 F. Supp. 3d at 404 (quotation marks omitted). In addition, "[e]ven if the employer had 'objectively valid grounds for the discharge,'" the plaintiff can establish a violation of the law if "'the employer was motivated by retaliatory animus.'" *McPartlan-Hurson v. Westchester Cmty. Coll.*, No. 13-CV-2467 (NSR), 2018 WL 3104094, at *15 (S.D.N.Y. June 21, 2018) (quoting *Summer v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)), *aff'd*, 804 F. App'x 41 (2d Cir. 2020) (summary order).

---

[33] The Second Circuit has yet to determine the exact causation standard required at this stage in the FLSA context. *See Fox*, 2023 WL 407493, at *1 n.1 (declining to determine whether the "but-for" standard applies to FLSA retaliation claims, as it does for Title VII retaliation claims); *Scalia v. Sarene Servs., Inc.*, 740 F. Supp. 3d 251, 299 (E.D.N.Y. 2024) ("The Second Circuit has not established the standard for causation for FLSA retaliation claims."). *But see Walsh v. Ip*, No. 22-CV-00886 (MAD) (TWD), 2023 WL 3377629, at *3 (N.D.N.Y. May 11, 2023) (applying the "but-for" causation standard for Title VII claims to an FLSA retaliation claim).

Applying the *McDonnell Douglas* framework in the context of Title VII, the Second Circuit has observed that "'[i]f the record conclusively reveals a nondiscriminatory reason for the employer's decision, or if the plaintiff creates only a weak issue of fact as to pretext and there is abundant and uncontroverted independent evidence that no discrimination has occurred,' then the employer is entitled to judgment as a matter of law." *Crawford v. Dep't of Investigation*, 324 F. App'x 139, 142 (2d Cir. 2009) (cleaned up) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)); *see also Richardson v. Comm'n on Hum. Rts. & Opportunities*, 532 F.3d 114, 125–26 (2d Cir. 2008).

Plaintiff testified that Allied terminated him at least in part because he was not working. (*See* Habib Dep., ECF No. 33-4, at 92:10–16 ("Q. Have you ever been fired from any job? A. No, no. It is just Allied and, yes, when I refuse to go to the office I believe that was the reason they terminated me, not the main reason, but that was the reason.").) At the same time, Plaintiff testified about his belief that Allied fired him because he filed a lawsuit against them. (*See id.* at 131:14–18 ("Q. Do you think the reason that Allied has not offered you an employment opportunity is because you filed a lawsuit against them? A. Absolutely.").)

Plaintiff argues that Defendant's stated reason for his termination has changed over time and that Allied's shifting response indicates that its stated reason for his firing was pretextual. (Response, ECF No. 34, at 11–14.) Timing and this allegedly shifting rationale are the only arguments Plaintiff marshals to prove pretext.[34] (*See id.* at 19–23.) Plaintiff frames the alleged shift as follows: first, Defendant claimed Plaintiff quit his

---

[34] As noted above, timing alone is generally insufficient to rebut the presumption that Plaintiff's termination was legitimate and non-retaliatory. *El Sayed*, 627 F.3d at 933.

position at Sears; second, they claimed he was fired for being unresponsive; and third, they stated his employment was terminated because he refused to work. (*Id*. at 11–14.) Plaintiff also notes that the 21-day rule serves as a fourth justification. (*Id*. at 23.)

None of these rationales are inconsistent with each other. There are no material facts in dispute as to whether Plaintiff left his position at Sears, and that he rebuffed the prospect of short-term employment with T-Mobile. The parties disagree about Plaintiff's responsiveness. Tchou testified that he and Abraham called Plaintiff repeatedly during this period to help him find a position, but that Plaintiff never picked up or responded. (Tchou Dep., ECF No. 33-10, at 17:13–22:5.) Plaintiff's counsel claims that he did pick up these calls, but that claim is unsupported by evidence in the record. (*See* Oral Arg. Tr., ECF No. 19:4–7, 18:1–17.)[35]

As discussed above, Tchou formally notified Plaintiff that his employment at Allied would be terminated because he had not worked for over 21 days. (Def.'s 56.1, ECF No. 33-1, ¶ 118; Pl.'s 56.1, ECF No. 34-1, ¶ 118.) Tchou further testified that Plaintiff's unresponsiveness influenced his ability to obtain a new placement, and that his employment was ultimately terminated for inactivity. (*See* Tchou Dep., ECF No. 33-10, at 26:12–27:9 ("[I]f you are not responsive for work placement we can't keep you around lingering for a long period of time.").) As Defendant notes, "Plaintiff's resignation from Sears was the catalyst for his termination but was not the only event." (Reply, ECF No. 35, at 11.) Indeed, as set forth above, as a result of leaving his position at Sears and not working for over 21 days, Plaintiff's name appeared on the November

---

[35] Other text records do indicate that Plaintiff had discussions with Leary that are not captured in the text records, contrary to Plaintiff's assertions as set forth *supra*.

19, 2021 No Hours Report, which also would have led to his termination. (*See* Def.'s 56.1, ECF No. 33-1, ¶¶ 121–23 (citing Nov. 19, 2021 Email, ECF No. 33-43).)

Plaintiff, of course, sees things differently. That being said, he does acknowledge that Allied terminated him, at least in part, because he was not working, as discussed above. (*See* Habib Dep., ECF No. 33-4, at 92:10–16; *but see id.* at 131:14–18.) In addition, other than offering argument that Defendant has advanced a shifting rationale, Plaintiff's subjective beliefs about Allied's motivations, and surmise and conjecture based on timing and events that did not occur (such as Plaintiff's failure to get an interview in response to his applications), Plaintiff has not advanced admissible evidence from which a reasonable jury could find that Allied's explanations are pretextual and that Defendant was operating due to retaliatory animus.[36]

To rebut the presumption that Defendant's stated reason for firing Plaintiff is pretextual, Plaintiff must proffer more than "a scintilla" of evidence that Allied fired him with retaliatory intent. *See Anderson*, 477 U.S. at 252; *Brizzi*, 529 F. Supp. 3d at 51. Plaintiff relies almost entirely on the prospect that a jury could find that retaliation occurred based on the *lack* of evidence. (*See e.g.*, Oral Arg. Tr., ECF No. 37, at 35:23–

---

[36] This is not to imply that the evidence presents a crystal clear picture of what happened in the lead-up to Plaintiff's termination. The Court notes that Tchou testified that multiple parties were likely involved in the decision to fire Plaintiff but could not recall with specificity who was involved or what they considered. (*See* Tchou Dep., ECF No. 33-10, at 85:5–90:11.) Johnson also indicated that many people may have been involved. (*See* Johnson Dep., ECF No. 33-13, at 13:5–20, 13:24–14:25, 16:7–17:15.) Johnson thinks he likely spoke with Tchou and Abraham about Plaintiff's availability and potential placements in advance of his termination, but there is no record of the content of those discussions. (*Id*. at 39:17–42:7.) Neither supervisor Plaintiff deposed could remember what they discussed in advance of Plaintiff's termination. (*See id.*; Tchou Dep., ECF No. 33-10, at 87:8–17.) In the meantime, Plaintiff insists that these supervisors were responsible for Plaintiff's termination, regardless of the mandatory language in the No Hours Report. (*See* Oral Arg. Tr., ECF No. 37, at 20:9–24.) Notwithstanding some lack of clarity, however, Allied policy called for Plaintiff's termination due to the fact that he had not worked in over 21 days. Plaintiff has not adduced any evidence that would put that fact in issue.

36:7.) That is not sufficient. Notwithstanding the close timing of the alleged protected activity and the adverse employment actions, given the totality of the evidence adduced on summary judgment, the timing of the events here and inferences based on the lack of evidence are simply not enough for this case to go forward in light of Defendant's showing of non-pretextual reasons for its actions and Plaintiff's failure to advance sufficient evidence of retaliatory intent.

*  *  *  *  *

The Court is sympathetic to Plaintiff. After over decade of good work at Allied, the concept that his employer could not find him a suitable substitute placement after he left Sears must have felt incomprehensible and unjust. That does not mean that Allied retaliated against him for protected activity. Plaintiff has not established sufficient evidence to prove "that it is more likely than not the employer's decision" to fire or fail to rehire him "was motivated, at least in part, by an intent to retaliate." *Fox*, 2023 WL 407493, at *1 (quotation marks omitted). For the foregoing reasons, the Court recommends granting Defendant's motion for summary judgment on Plaintiff's retaliation claims under both the FLSA and the NYLL.

### III. FLSA and NYLL Wage Claims

As set forth above, Plaintiff concedes that Allied owes him no unpaid wages. (Def.'s 56.1, ECF No. 33-1, ¶ 24; Pl.'s 56.1, ECF No. 34-1, ¶ 24.) However, Plaintiff claims that Allied owes him pay for 68.10 unused vacation hours. (*See, e.g.*, Pl.'s 56.1, ECF No. 34-1, ¶ 24.) Defendant argues that Plaintiff cannot prevail on this claim because Plaintiff raises it for the first time in response to Defendant's motion for summary judgment. Although the Court recommends finding that Defendant is entitled to summary judgment on Plaintiff's FLSA wage claim and NYLL spread-of-hours claim, the Court further recommends declining to exercise supplemental jurisdiction over Plaintiff's

53

NYLL wage claim to the extent he has stated such a claim based on unpaid vacation pay.

## A. Legal Standard

The FLSA does not protect employees' rights to vacation or other fringe benefits. *See Arjumand v. Laguardia Assocs., L.P.*, No. 14-CV-4618 (WFK) (RLM), 2015 WL 1470470, at *5 (E.D.N.Y. Mar. 30, 2015). However, the NYLL sometimes does. The NYLL's definition of "wages" includes any agreed-upon vacation pay. *See* NYLL § 190(1) ("The term 'wages' also includes benefits or wage supplements as defined in section one hundred ninety-eight-c of this article, except for the purposes of sections" not applicable here); *id*. § 198-c(2) (providing that "the term 'benefits or wage supplements' includes, but is not limited to, reimbursement for expenses; health, welfare and retirement benefits; and vacation, separation or holiday pay").

A district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The decision whether to retain supplemental jurisdiction is "discretionary." *Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 263 (2d Cir. 2006); *see also Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). In determining whether to exercise supplemental jurisdiction, courts weigh the following factors: (1) judicial economy, (2) convenience, (3) fairness, and (4) comity. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004). When federal claims are dismissed before trial, the balance of these factors will "in the usual case" "point toward declining" jurisdiction over any remaining state law claims. *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Cohill*, 484 U.S. at 350 n.7). However, courts may choose to exercise supplemental jurisdiction where they have already performed extensive work on the case, where declining

jurisdiction would impose significant delay or prejudice, or where the interests of fairness and judicial efficiency strongly favor retention. *See, e.g.*, *Choi v. 37 Parsons Realty LLC*, 444 F. Supp. 3d 411, 425 (E.D.N.Y. 2020) (retaining jurisdiction where the relevant facts overlapped significantly); *EIG Energy Fund XIV, L.P. v. Keppel Offshore & Marine Ltd.*, No. 18-CV-1047 (PGG), 2020 WL 3488037, at *3 (S.D.N.Y. June 26, 2020) (retaining jurisdiction where the case had a "long and tortured history").

### B. Analysis

Here, the Court recommends declining to exercise supplemental jurisdiction over Plaintiff's remaining state law claim because judicial economy, convenience, fairness, and comity all weigh against retention. The Court has not expended significant judicial resources assessing Plaintiff's state law claims, and no exceptional circumstances warranting supplemental jurisdiction apply here. *Compare Okolie v. Paikoff*, 589 F. Supp. 2d 204, 220–21 (E.D.N.Y. 2008) (retaining jurisdiction after eleven years of litigation and extensive summary judgment briefing), *with Hanming Feng v. Soy Sauce LLC*, No. 15-CV-3058 (ENV) (LB), 2017 WL 6561160 (E.D.N.Y. Dec. 22, 2017), at *5 (declining jurisdiction of state claims in an FLSA case after discovery and a bench trial).

Comity further supports dismissal. The remaining claim arises solely under New York law, and New York state courts are better positioned to resolve it. *Baptiste v. W Hotel*, No. 04-CV-5544 (DLC), 2005 WL 1020779, at *5 (S.D.N.Y. Apr. 27, 2005) ("[T]he principle of comity dictates that where a plaintiff's remaining claims solely sound in state law, a federal court should decline to exercise jurisdiction."). Accordingly, the Court recommends against exercising supplemental jurisdiction over Plaintiff's remaining NYLL claim, to the extent one was pleaded as part of his unpaid wage claim, as a matter of discretion under 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the reasons described above, the Court recommends granting Defendant's motion for summary judgment, in part. Specifically, the Court recommends granting Defendant's motion for summary judgment as to Plaintiff's FLSA and NYLL retaliation claims (counts three and four), his FLSA unpaid wage claim (count one), and his NYLL spread-of-hours claim (count five), and dismissing Plaintiff's NYLL unpaid wage claim (count two), without prejudice.

\*   \*   \*   \*   \*

This report and recommendation will be filed electronically. Objections to this report and recommendation must be filed, with a courtesy copy sent to the Honorable Eric N. Vitaliano at 225 Cadman Plaza East, Brooklyn, New York 11201, within fourteen (14) days of filing. Failure to file objections within the specified time waives the right to appeal both before the district court and appellate courts. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, e.g., Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate[ judge's] decision" (quotation marks omitted)).

SO ORDERED.

Dated:  Brooklyn, New York
     July 25, 2025

                              _____
                              TARYN A. MERKL
                              UNITED STATES MAGISTRATE JUDGE